STATE of Maine

v.

Jeffrey LIBBY.

Supreme Judicial Court of Maine.

Argued May 13, 1988.
Decided July 29, 1988.

James E. Tierney, Atty. Gen., Charles
Leadbetter, Wayne Moss (orally), Rae Ann

French, Asst. Attys. Gen., Augusta, for plaintiff.

James M. LaLiberty (orally), Butler, Whittier & LaLiberty, Waterville, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

Defendant Jeffrey Libby appeals from a judgment of the Superior Court (Kennebec County) entered on a jury verdict finding him guilty of murder, 17–A M.R.S.A. § 201(1)(A) (1983). Defendant challenges 1) the Superior Court's denial of his motions to suppress physical objects obtained from a warrantless search and statements he made to the police after invoking his right to counsel, 2) the admission of certain evidence, 3) the court's refusal to give requested jury instructions with regard to the manner and cause of the victim's death, 4) the State's proof of the *corpus delicti,* and 5) the sufficiency of the evidence. Rejecting defendant's appellate contentions, we affirm the conviction.

The jury would have been warranted in finding the following facts. At about 2:15 a.m. on July 8, 1986, defendant called the Winslow police to report finding his grandfather, Percy Libby, dead, apparently from drowning in his bathtub. Defendant lived with his grandfather at the time, and he told the police that he had returned home at about 2:00 a.m. and discovered his grandfather's body. The police and the emergency response team, after arriving at Percy's house, found him lying naked and face up in the filled tub, as if he had been taking a bath. Diana York, Percy's sister-in-law, and Larry Loubier, a neighbor, were called to the scene that night. Both expressed surprise that Percy was found in the bathtub since he typically took only sponge baths.

On July 11, 1986, Libby initially waived his *Miranda* rights and spoke to the police for 45 minutes. Although Libby denied

any involvement in Percy's death, he was arrested following his statements to the police. On July 16 the police searched Percy's home pursuant to a search warrant. The warrant did not in specific terms include the garage, however, and police obtained consent for searching the garage from Diana York. Percy's skin medication and his damp slippers and pants were found in a trash can in the garage. On August 7, 1986, defendant was indicted for Percy's murder and was convicted on July 14, 1987.

## I. *Suppression Issues*

### A. *Search of the Garage*

Defendant first argues on appeal that the Superior Court erred in denying his motion to suppress admission of Percy's medication and his damp slippers and pants found during the July 16 warrantless search of the garage.[1] He argued before the Superior Court that the items seized should be suppressed because Diana York had no authority to consent to the search of Percy's garage. We affirm the court's holding that in all the circumstances here present York had authority to consent to the search.

Consent to authorize a warrantless search may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). A finding of consent under *Matlock* properly focuses on whether the third party giving consent has sufficient authority or control in his own right over the premises, regardless of how much control the defendant may have. *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7. At the suppression hearing the Superior Court found that Diana York had sufficient common authority or control over Percy's premises to authorize her consent to the search. That finding is not clearly erroneous because there is competent evidence to support it. *See State v. Reeves,* 499 A.2d 130, 132 (Me.1985).

---

**1.** We assume, without deciding, that Libby has standing under *Rakas v. Illinois,* 439 U.S. 128,

140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), to challenge the July 16 warrantless search.

Diana York's access to and physical control over Percy Libby's residence was the result of her long association with him. York was Percy's sister-in-law and they had been friends for 40 years. She lived with Percy and his wife from 1954 to 1956 following her father's death. More recently, in the late summer of 1985 Percy's longstanding dry skin problem developed into a severe skin rash that lasted until the spring of 1986. Diana often helped Percy at his home by applying lotion to his neck, back, and legs. Moreover, on December 8, 1985, Percy's wife of 39 years died. In the months that followed Percy relied especially on York's comfort and friendship. York had a copy of Percy's house key, and the factfinder could rationally conclude that Percy expected her to have complete access to the entire premises. Although York did not have a separate key to the garage, she did not need it because Percy routinely kept the overhead garage door open. Both York and Percy lived in Winslow, and York visited Percy often immediately following his wife's death and at least once a week thereafter until his death. Indeed, Percy had already signed a purchase and sale agreement to sell his house. He intended to move in with York and her husband following the sale.

Diana York's close relationship with Percy and her control over and access to his residence is confirmed by her role as both a devisee under Percy's will and the personal representative of his estate. Percy had split his estate equally between York and defendant. Immediately upon Percy's death York, as a devisee, became vested with at least a one-half interest in Percy's real estate "subject only to the right of the personal representative ... to use it to pay creditors...." *Bourgeois v. Sprague*, 358 A.2d 521, 522 (Me.1976). As the personal representative, York had additional power to control both the real and personal property on the premises. 18–A M.R.S.A. § 3–709 (1981) states:

> Except as otherwise provided by a decedent's will, every personal representative has a right to, and shall take possession or control of, the decedent's property.... The personal representative shall ... take all steps reasonably necessary for the management, protection and preservation of[ ] the estate in his possession.

As the personal representative [2] York was entrusted with the primary responsibility for the settlement of Percy's estate. *See, e.g.,* 18–A M.R.S.A. §§ 3–703(a), 3–706, 3–711 (1981 & Supp.1987). *See also Estate of Baldwin,* 442 A.2d 529, 532 (Me.1982). York was very aware of her status under Percy's will and of her responsibilities as personal representative. On being called to Percy's house on the night of his death, York went to his desk where she knew he kept his will and showed it to the police. She did so intending to notify the police of her authority to remove Percy's leased car from the premises.[3]

Considering the totality of the circumstances, including York's access to and control over Percy's premises before his death as well as her legal status as devisee and personal representative, the Superior Court did not err in finding that York had proper authority to consent to the search of Percy's garage.

### B. *Defendant's Statements to the Police*

Defendant next argues that the Superior Court erred in denying his motion to suppress statements made to the Winslow police during a custodial interrogation on July 11, 1986. Defendant initially waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and voluntarily talked to the police, denying any responsibility for Percy's death. After 45 minutes of discussion, however,

---

2. The Probate Court did not appoint York as personal representative until July 18. Her status as personal representative relates back to the consent she gave for the search on July 16, however, because her actions were clearly "beneficial to the estate." 18–A M.R.S.A. § 3–701 (1981).

3. York wanted to remove the car because she did not want defendant to drive it since his license to drive was suspended at the time.

defendant invoked his right to have counsel present and the police terminated the taped interview. Defendant concedes on appeal that following his demand for counsel and the termination of the interview, he initiated further discussion with the police. After the police gave him a second set of *Miranda* warnings, defendant proceeded to give a different version of his involvement in Percy's death.[4]

■■■ Under *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), admissibility of a defendant's statements given to the police in a custodial interrogation following an invocation of the right to counsel requires two separate inquiries. First, the defendant must have himself initiated a further "generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045, 103 S.Ct. at 2835. Second, the defendant, in the totality of the circumstances, must have knowingly and intelligently waived his right to have counsel present. *Id.* at 1046, 103 S.Ct. at 2835; *see also Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1938). Here defendant concedes that he initiated the further discussion with the police. He argues, however, that the Superior Court erred in denying his motion to suppress because the court did not make an express finding that he had waived his right to counsel, made known to him as part of his *Miranda* warnings.

In its suppression order the court noted that defendant had been given a second set of *Miranda* warnings. The court then found that defendant

> is an intelligent and fairly sophisticated young man familiar with the import and meaning of his rights as they are protected by *Miranda*.... [He] is a high school graduate, who, in three previous encounters with police, has received *Miranda* warnings.

Defendant's intelligence, sophistication, and familiarity with *Miranda* all relate to his waiver of his right to counsel and not to his initiation of further discussion with the police. The Superior Court's implicit finding of waiver was the result of an analysis separate from that used to determine whether defendant had initiated further discussion with police. Examination of the transcript of Libby's interview with the police clearly supports the Superior Court's implicit finding that defendant had knowingly and voluntarily waived his *Miranda* rights a second time. There was no error.

## II. *Evidentiary Issues*

### A. *State's Rebuttal Evidence*

[6, 7] Defendant next argues that the Superior Court abused its discretion in admitting rebuttal testimony from the State's medical expert, Dr. Ronald Roy, that Percy's death was not inconsistent with heart failure induced by a choke-hold. Rebuttal testimony is proper if it "contravenes, antagonizes, confutes, or controls 'the inference sought to be drawn by new facts introduced by the adverse party at the next previous stage.'" *Payson v. Bombardier, Ltd.*, 435 A.2d 411, 413 (Me.1981) (quoting *Emery v. Fisher*, 128 Me. 124, 125, 145 A. 747, 747 (1929)). We review the court's decision with "considerable deference to his opportunity to assess the evidence in light of the testimony to be rebutted and the manner in which it was presented to the jury." *State v. Berry*, 495 A.2d 1207, 1210 (Me.1985).

■■■ Here defendant contends that during discovery the State indicated it would pursue a theory of death by drowning and that he was therefore prejudiced at trial by Dr. Roy's rebuttal testimony that Percy's death could possibly have been caused by a choke-hold induced heart failure.[5] During the State's case-in-chief, the doctor testified

---

4. Defendant's second version of Percy's death, admitted at trial, was that two men on motorcycles came to the house and demanded money of defendant. When he did not give them any money, they threatened him and ordered him to leave the premises, which he did. Upon his return defendant found that the two men had killed Percy.

5. We note that the Superior Court denied both defendant's motion for a bill of particulars and that part of his discovery request seeking disclosure of the "manner in which the Defendant is alleged to have caused the death."

that Percy's death was "consistent with drowning. I believe [Percy] did drown." In addition, Dr. Roy opined that the manner of death was a homicide. During defendant's case-in-chief, defendant's own medical expert, Dr. Richard Chassee, testified that Percy died because of heart failure. On rebuttal the State sought to control the effect of Chassee's testimony by placing the heart failure theory in the context of a homicide, namely, that a chokehold on the victim in the course of the drowning could have induced heart failure. There was no abuse of discretion in admitting that proper rebuttal testimony.

### B. *Habit Evidence*

■ Defendant next contends that the court abused its discretion in admitting Diana York's testimony indicating that Percy "never went in the water" and was at the time of his death "still taking sponge baths." Under M.R.Evid. 406(b) evidence of "[h]abit or routine practice may be proved by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine." To be admissible under Rule 406, evidence of habit must "describe[ ] one's regular response to a repeated specific situation so that doing the habitual act becomes semi-automatic. It is the notion of the invariable regularity that gives habit evidence its probative force." *Arel v. Poirier*, 533 A.2d 1285, 1287 (Me.1987) (quoting M.R.Evid. 406 adviser's note *reprinted in* Field & Murray, *Maine Evidence* at 118 (1987)).

Here the court did not abuse its discretion in admitting the evidence tending to show Percy's "habit or routine practice." First, York knew that Percy had a dry skin condition that existed from at least 1954 up until his death, and due to which Percy avoided total immersion bathing. Indeed, during 1954–56, when York lived with Percy and his wife, York never saw him take a bath in a bathtub. Second, Percy's skin condition was exacerbated by a rash that lasted from the summer of 1985 until sometime in the spring of 1986. As a daily response to his rash, York testified that Percy was instructed by his doctor to take

a sponge bath every day before applying lotion to his rash. Moreover, York testified that she herself often applied the lotion to Percy's neck and back following his sponge bath. In addition, York testified that Percy continued to take only sponge baths even after his rash had abated a month or so before his death. That evidence is sufficient to show that Percy's avoidance of total immersion bathing was a "regular response to a repeated specific situation." *Arel v. Poirier*, 533 A.2d at 1287.

### C. *Identification of Defendant as Phone Caller*

■ Defendant also argues that the Superior Court abused its discretion by admitting into evidence testimony of one Fred Short who stated that he received a phone call from an unidentified person soliciting his help in killing that person's grandfather. Libby contends that the evidence should have been excluded because the State did not properly authenticate the identity of the caller. Under M.R.Evid. 901(b)(4) evidence can be authenticated if there is sufficient proof of its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

Here the substance of the call was indeed distinctive. Short testified that the caller offered Short $1,000 to help him drown his grandfather. The caller also told Short that the drowning had to occur within one week or the caller would be written out of his grandfather's will and be forced to move from his grandfather's house. Defendant contends that the substance of the call was not sufficiently distinctive to qualify under Rule 901(b)(4) because four additional State witnesses also knew of the call's contents. Generally, the "more persons who know the facts recited, the weaker is the force of the inference [that the evidence is sufficiently distinctive]." Field & Murray, *Maine Evidence* § 901.2(4), at 392 (1987). The inference of distinctiveness here, however, "may be buttressed by showing that in the circumstances the other persons with knowledge would

probably not have [made the phone call]." *Id.*

It is unlikely that any of the four State witnesses who also knew of the call's contents would have made the call. First, although defendant's girlfriend, Lisa Gilbert, knew of the call's contents, she could not personally have made the call because Short continually used the male pronoun "he" in referring to the unidentified caller. It was within the court's discretion to believe that Short was familiar enough with the sound of a male voice, as opposed to a female voice, to identify the caller as a male. *See* M.R.Evid. 901(b)(5). Second, the three other State witnesses familiar with the contents of the call were not likely to have been the caller because all three had themselves received and rejected similar solicitations from defendant. All three could personally identify defendant because he had approached them in person. All three testified that, as in the telephone solicitation of Short, defendant had requested their help in drowning his grandfather in the bathtub because defendant believed he would soon lose his inheritance and be forced to move out of his grandfather's house. Moreover, two of the witnesses, Ricky Lane and Andrew Wood, both testified that after rejecting defendant's offer to them, they gave him Fred Short's phone number. Short testified that he asked the caller how the caller got his name and was told that "two friends" of Short had provided it. Short understood the two friends to be Lane and Wood. Thus, given the distinctiveness of the call's substance and its surrounding circumstances, there was no abuse of discretion in admitting the testimony.

### III. *Jury Instructions*

 Defendant next contends that the Superior Court erred in refusing to give two requested jury instructions. First, as to the manner of death, he requested that the court instruct the jury that "[i]n order to convict, the State must prove beyond a reasonable doubt that death did not result from accident, natural causes or suicide and that it was caused by the Defendant." Second, as to the cause of death, the requested instruction stated that "the State must prove beyond a reasonable doubt that the cause of death was drowning, and that the drowning was not accidental or suicidal."

The court in fact instructed the jury in pertinent part as follows:

So in order to support a guilty verdict the state must prove beyond a reasonable doubt: One, that Percy Libby is dead; two, that Jeffrey Libby caused his death; three, that Jeffrey Libby's conduct was voluntary; four, that Jeffrey Libby acted intentionally or knowingly. If you find all four of these facts have been established beyond a reasonable doubt then you must find the defendant guilty. If you conclude on the other hand that the state has failed to establish beyond a reasonable doubt any of these elements, then you must find the defendant not guilty.

There was no error in the court's instruction as given. The State was not required to disprove affirmatively every possible means of death other than drowning. A jury's guilty verdict

must be based not on a determination that there exists no alternative explanation, but that, after assessing the credibility of such explanations, they raise no reasonable doubts as to the defendant's guilt.

*State v. LeClair*, 425 A.2d 182, 184 (Me. 1981). In the course of its determination that the State had proven beyond a reasonable doubt that Jeffrey Libby's voluntary and intentional or knowing conduct caused Percy Libby's death, the jury *a fortiori* was convinced beyond a reasonable doubt that Percy did not die from natural causes, suicide, or accident. There is of course no need for the jury to find the exact mechanism, such as drowning, by which defendant's conduct had caused Percy's death. Thus the court was not required to give the requested instructions.

### IV. *Corpus Delicti*

 Even though defendant made no objection to the order of proof on the ground of the State's failure to establish

*corpus delicti* prior to offering defendant's own incriminating statements, defendant's motion for acquittal at the end of the evidence did preserve his contention that the State had not satisfied the *corpus delicti* rule in its substantive aspect. *See State v. Curlew,* 459 A.2d 160, 164 (Me.1983). In that aspect, the *corpus delicti* rule requires the State, for its case to withstand the motion for acquittal, to have proved the fact of death of the victim and the criminal agency of another responsible therefor, to two separate standards. *State v. Chapman,* 496 A.2d 297, 303 (Me.1985); *State v. Rowe,* 479 A.2d 1296, 1300 (Me.1984). First, independent of any post-crime admissions or confessions made by defendant, the State must have proved the *corpus delicti* to a probable cause standard, i.e., the State must have proved the basis for a substantial belief therein.[6] Then, the State must also have established the *corpus delicti* beyond a reasonable doubt considering the entire evidence, including any post-crime admissions or confessions made by defendant. *See State v. Rowe,* 479 A.2d at 1300.

■ Defendant argues that the State failed to meet its substantive burden of proving that Percy's death was caused by the "criminal agency of another" rather than by natural causes, accident, or suicide. *State v. Anderson,* 409 A.2d 1290, 1301 (Me.1979). That argument fails. Evidence supporting the *corpus delicti,* exclusive of

defendant's post-crime admissions and confessions, is as follows: First, although Percy's body was found in the tub, there was substantial evidence that Percy would not have taken a bath voluntarily. Second, Dr. Roy, the State's medical expert and the only certified pathologist to testify, stated that he believed Percy was a homicide victim and that death had been caused by drowning. Third, although Percy had been depressed six months earlier over the death of his wife, numerous witnesses testified that he had revived and was looking forward to moving in with his sister-in-law. Fourth, the day after Percy's death neighbors saw defendant putting items in the trash, which trash was later found to contain Percy's wet slippers and pants. Fifth, there was testimony from four different people that defendant had solicited them to help drown his grandfather in the tub. And finally, there was testimony from defendant's girlfriend that he told her he intended to drown Percy and showed her how he would accomplish it. Without question this evidence raises a substantial belief that Percy's death was the result of the criminal agency of another. Moreover, adding to this evidence Libby's post-crime inquiry of York as to how he could stop the prosecutor's investigation, together with his statements to the police, the whole record proves the *corpus delicti* beyond a reasonable doubt.

6. We here make explicit what has been implicit in many of our prior cases. Past considerations of the sufficiency of *corpus delicti* evidence "exclusive of any admission or confession of the defendant" refer only to a defendant's *post-crime* admissions. *State v. Curlew,* 459 A.2d 160, 164 (Me.1983). *See, e.g., State v. Chapman,* 496 A.2d 297, 303 (Me.1985); *State v. Rowe,* 479 A.2d 1296, 1299 (Me.1984); *State v. Anderson,* 409 A.2d 1290, 1300 (Me.1979). Only a defendant's post-crime admissions or confessions need the independent corroborative evidence required by the *corpus delicti* rule. The State *may* use a defendant's pre-crime statements as part of its independent proof of the *corpus delicti* to the probable cause standard. The rationale behind the *corpus delicti* rule has always been "the desire to safeguard against the possibility of a confession for an alleged crime not in fact committed." *State v. Davis,* 374 A.2d 322, 323 (Me. 1977). *See also State v. Anderson,* 409 A.2d 1290, 1300 (Me.1979); *State v. Grant,* 284 A.2d

674, 675 (Me.1971). The danger of false confessions, which the *corpus delicti* rule protects against, does not inhere in pre-crime admissions. Indeed, a defendant's pre-crime admissions have long been admissible in Maine as substantive evidence of the *corpus delicti. See Cayford's Case,* 7 Me. 57, 58 (1830) (defendant, prosecuted for bigamy, made statements *before* his second, bigamous marriage indicating that he had a first wife and family, which statements were admissible and sufficient proof of his first marriage). *See also Ham's Case,* 11 Me. 391, 396 (1834).

The Supreme Court has also long recognized the distinction between pre- and post-crime admissions for purposes of proving *corpus delicti* that we make explicit here. *See Smith v. United States,* 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954); *Warszower v. United States,* 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941).

### V. *Sufficiency of the Evidence*

■ Finally, defendant argues that the evidence was insufficient to convict him of murder. Here, unlike proof of the *corpus delicti,* the State must convince the jury of every element of the offense, including of course defendant's identity as the murderer. The jury heard Diana York's testimony that Percy intended to write defendant out of his will once Percy sold his house and moved in with her. Thus, given defendant's inheritance motive to kill his grandfather, and considering all the additional evidence discussed under the *corpus delicti* analysis, the jury could rationally find Libby guilty of all the elements of murder beyond a reasonable doubt. *See State v. Barry,* 495 A.2d 825, 826 (Me.1985).

The entry is:

JUDGMENT AFFIRMED.

All concurring.