STATE of Maine

v.

Dennis LARSON.

Supreme Judicial Court of Maine.

Argued June 2, 1990.

Decided July 2, 1990.

James E. Tierney, Atty. Gen., Garry Greene (orally) and Jeffrey Hjelm, Asst. Attys. Gen., Augusta, for the State.

William N. Ferm (orally), Ferm, McSweeney & Collier, Ellsworth, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

1. Larson's first wife died in Montana in 1975.

McKUSICK, Chief Justice.

Dennis Larson appeals the judgment of the Superior Court (Hancock County, *Smith, J.*), entered after a jury-waived trial, convicting him of intentionally or knowingly causing the death of his wife Kathy Frost Larson by pushing her off Otter Cliffs in Acadia National Park. Finding no error in any of the court's rulings and finding ample evidence to support Larson's conviction, we affirm.

## I.

### The Facts

Following a divorce from his second wife in Montana in May 1987, Dennis Larson came to Maine in June to work as a construction electrician in East Millinocket.[1] He promptly joined a computer dating service and placed on-going personal advertisements in two area newspapers seeking a "childless lady." His express purpose in seeking female companionship was immediate marriage. After she responded to one of his advertisements, Larson called Kathy Frost, a nurse's aide, at her home in Dexter. He asked her to marry him within two weeks after their first meeting. They were married on Sunday, September 20, 1987.

The next morning, the newlyweds met with Timothy Callahan, a sales representative for Allstate Insurance at Sears in the Bangor Mall. They purchased a combined universal life insurance policy of $300,000 coverage on his life and $200,000 on hers, with double indemnity for accidental death. They named each other primary beneficiaries and prepaid the policies for two months. Larson subsequently contacted Callahan about reducing the face amount of the policies and set up a meeting for Monday, October 12, to meet and discuss the changes.

On Friday, October 9, Kathy told her mother that the couple planned to go to Acadia National Park the next day. Kathy was afraid of heights and water and, unlike Larson, professed no love for the outdoors. She told her mother that she did not want to go to the Park and was going only to please her new husband. The couple did

go to the Park and to Otter Cliffs on Saturday but, according to Larson, decided to return the next day because the area was too crowded. That night at work, Kathy told a friend that she was depressed about her marriage but that it was at least better than being alone. She also told the friend that she planned to return to the Park with Larson on Sunday.

On Sunday evening, October 11, Larson arrived alone at the Jordan Pond House in the Park to report that someone had fallen off a cliff. Park rangers arriving at Otter Cliffs at about 7:00 p.m. were told by Larson, who arrived there shortly after they did, that his wife had fallen. He showed them where her body was on the rocks beneath the Cliffs. Rescue personnel rappelled the Cliffs but Kathy's body had to be removed by boat. Her death had been instantaneous after the 80–foot fall.

The Maine State Police investigation, led by Detective Jeffrey Harmon, began the day after Kathy's death. Harmon conducted extensive interviews with Larson from that time until Larson's arrest the following February. Larson himself instigated many of their meetings either by visiting Harmon at the State Police barracks in Orono or by calling him at the barracks or at his home. Larson insisted throughout this period that he and Kathy had gone their separate ways upon arriving at Otter Cliffs on that Sunday and that she must have slipped on the rocks and fallen over the Cliffs' edge. At the beginning of November Larson returned to Montana whence, on November 12, he called the Allstate office in Bangor and instructed Callahan to begin the claims process on Kathy's life insurance policy.

Following three months of investigation, Harmon met with Larson in Montana on February 2, 1988. During that interview, Larson admitted that he had been lying and told Harmon that the couple had had an argument at the Cliffs, that during the argument he had pushed Kathy, and that she had fallen over the Cliffs' edge. He was immediately arrested. Upon his re-turn to Maine, the Hancock County grand jury indicted Larson for Kathy's murder on two counts: intentionally or knowingly causing her death (Count I), 17–A M.R.S.A. § 201(1)(A) (1983); and causing her death through conduct manifesting depraved indifference to the value of human life (Count II), *id.* § 201(1)(B) (1983). Larson pleaded not guilty. He later waived his right to a jury trial. After an eight-day trial, the court found Larson guilty on Count I, charging intentional murder.[2] After denying several post-trial motions, including Larson's motions for acquittal and for a new trial, the court sentenced Larson to 50 years' imprisonment. This appeal follows.

## II.

### Evidentiary Issues

■ Prior to trial defendant asked the court to suppress all of the statements he made to Detective Harmon during the investigation. Defendant contended that the empathetic and friendly manner in which Harmon interacted with defendant constituted psychological coercion, rendering all of defendant's statements inadmissible because they were not voluntary. Defendant introduced expert psychological testimony to the effect that he had an overwhelming need to please people, and argued that when he confessed to pushing his wife off the Cliffs he was only trying to tell Harmon what he thought Harmon wanted to hear. Reviewing the suppression justice's decision for clear error, *see State v. Barczak*, 562 A.2d 140, 144 (Me.1989), we find none. In the totality of the circumstances, the State was able to prove beyond a reasonable doubt that each statement defendant made was freely made with the knowledge that he was speaking with a police detective investigating Kathy's death. *See State v. Lagasse*, 575 A.2d 1224 (Me.1990); *State v. Collins*, 297 A.2d 620, 627 (Me. 1972). There is nothing in the record that reflects any kind of coercion or exploitation

2. The State contends on appeal that the court erred in refusing to enter a verdict on Count II, depraved indifference murder. Since it is unnecessary for us to address this argument in order to dispose of the contentions Larson raises on appeal and the State has not cross-appealed, the issue is not before us.

by Harmon. Defendant's statements were properly admitted as voluntarily made. *Id.* *See also State v. Mikulewicz*, 462 A.2d 497, 501 (Me.1983).

■ Defendant also contends that the trial court erred on a number of evidentiary rulings by admitting, in the face of objections under M.R.Evid. 403, evidence that was unfairly prejudicial more than probative. We review these rulings for abuse of discretion, *see State v. Sproul*, 544 A.2d 743, 747 (Me.1988), and find none. Richard Balhizer, defendant's friend, testified that defendant some nine years earlier in conversation with him had outlined a scheme of marrying a foreign woman, purchasing life insurance for her, arranging her accidental death, and collecting the proceeds of her insurance. The Superior Court was justified in finding this testimony relevant to the State's theory that defendant had actually carried out that scheme with Kathy as his victim. The singularity of defendant's discussion with Balhizer and its probative value mitigates its remoteness which, in this situation affects the weight to be accorded Balhizer's testimony, not its admissibility. *See State v. Ledger*, 444 A.2d 404, 414 (Me.1982). *Cf. State v. Rowe*, 479 A.2d 1296, 1300 (Me. 1984) (court weighs remoteness against probative value in determining admissibility under M.R.Evid. 403). The same analysis applies to the testimony of Joseph Wanago, an insurance claims adjuster from Montana who had processed defendant's claim on the death of his first wife some twelve years earlier. The State offered Wanago's testimony to show defendant's experience and familiarity with life insurance and death benefits following the accidental death of a spouse, an experience infrequently encountered. Defendant contends that the innuendo value of Wanago's testimony greatly increases the danger of unfair prejudice, but a court sitting as the factfinder is presumed to accept admissible evidence only for the purpose for which it may be admitted. *See State v. Williams*, 387 A.2d 27, 30 (Me.1978). Defendant points to nothing to rebut that presumption in this case.[3] We also find no error in any of the other evidentiary rulings defendant challenges on appeal.

## III.

### *Sufficiency of the Evidence*

■ One of defendant's principal contentions on appeal is that the State failed to prove *corpus delicti*, i.e., that the victim's body was indeed that of Kathy Frost Larson and that the death had been caused by a criminal agency. The State bears different burdens of proof under the *corpus delicti* rule: first, to present evidence independent of the defendant's own statements adequate to prove both elements of *corpus delicti* to a probable cause standard and, second, to present evidence, including any post-crime admissions or confessions made by the defendant adequate to establish the *corpus delicti* beyond a reasonable doubt. *See State v. Libby*, 546 A.2d 444, 451 (Me. 1988). Independent of defendant's own statements, the evidence presented by Kathy's mother and friends regarding her plans to be at the Park on Sunday, as well as the physical descriptions of both Kathy and the victim's body provided by a number of witnesses, clearly established to a probable cause standard that the victim was indeed Kathy Frost Larson. Contrary to defendant's contention that the court erred in allowing the State to reopen evidence on this limited issue after having rested, there was no error in the court's decision to allow reopening in the absence of surprise or unfair prejudice to the defense. *See State v. White*, 460 A.2d 1017, 1023 (Me.1983); M.R.Crim.P. 26(c). There was no such surprise or unfair prejudice resulting from the reopening in this case.[4] Further, the evi-

---

3. In fact, the State stipulated that there was nothing untoward in the death by drowning of defendant's first wife, and defendant himself raised the specter of wrongdoing by highlighting its innuendo significance.

4. Indeed, defendant offered to stipulate to the content of the proposed testimony regarding identification of Kathy's body, ostensibly to avoid any adverse emotional impact such testimony could produce. He cannot argue, then, that he was unfairly surprised or unfairly prejudiced by the testimony itself. Because defen-

dence presented by the State independent of defendant's confession, i.e., that the first purchase made by the newlyweds had been a substantial life insurance policy and that Kathy, although she was not a devotee of the outdoors and was afraid of heights, was returning to the Cliffs with defendant at his urging, proved to a probable cause standard that a criminal agency had been involved in Kathy's death. Defendant's own admission that he had pushed his wife off the Cliffs completely satisfies the State's burden of proving both elements of the *corpus delicti* beyond a reasonable doubt.

■ Following his conviction, defendant moved for a judgment of acquittal or a new trial. On appeal, he challenges the trial court's denial of these motions and contends that there was insufficient evidence presented to support his conviction. On appeal of a motion for judgment of acquittal in a jury-waived case, the test applied by this court is "whether, in view of all the testimony, there was believable evidence from which a single justice, acting as the factfinder, was warranted in believing beyond a reasonable doubt that the defendant was guilty." *State v. Dyer,* 371 A.2d 1086, 1089 (Me.1977). *See also* Cluchey & Seitzinger, *Maine Criminal Practice* § 29.4, at 29–8 to –9 (Supp.1989). The standard is the same on review of the denial of a motion for new trial on the same ground of the insufficiency of the evidence. *See State v. Hall,* 383 A.2d 663, 665 (Me.1978); Cluchey & Seitzinger § 29.5, at 29–12. *See also State v. Barry,* 495 A.2d 825, 826 (Me.1985).

■ The State presented more than adequate evidence to warrant the Superior Court's belief beyond a reasonable doubt that defendant did indeed intentionally or knowingly murder Kathy Frost Larson.

Having proved the *corpus delicti,* the State also proved that defendant had previously outlined a scheme to make money from life insurance through the "accidental" death of a wife, that he came to Maine actively seeking a wife, that despite the apparent differences in their interests he married Kathy soon after meeting her and immediately took out a substantial life insurance policy on her life with double indemnity in case of her accidental death. Combined with all of the other evidence, defendant's confession that he had in fact pushed Kathy off the Cliffs established beyond a reasonable doubt the elements of the State's case for intentional or knowing murder. *See id.*

■ Finally, we find no merit whatsoever in defendant's argument, made for the first time after his conviction, that the state court lacked jurisdiction to try him because the crime occurred in a national park. There is no question that in October 1987 the State had criminal jurisdiction concurrent with that of the federal government over Acadia National Park. 1 M.R.S.A. § 8 (1989) provides a mechanism, including consent or approval by the appropriate federal authorities, for the cession and retrocession of concurrent legislative jurisdiction between the State and federal government for federal enclaves located within the geographic boundaries of Maine.[5] The state legislature completed all of section 8's requirements in obtaining concurrent jurisdiction over Acadia National Park in 1986, declaring its concurrent jurisdiction in P. & S.L.1985, ch. 94. The federal government completed the process on June 17, 1986, by approving the retrocession of concurrent jurisdiction pursuant to 40 U.S.C. § 255 (1986). Concurrent jurisdiction over Acadia National Park having been properly obtained by legislative action

---

dant indicated that he would continue to press his *corpus delicti* objection, however, the State refused to stipulate to the testimony.

5. "Concurrent legislative jurisdiction" vests in the State and in the United States "all rights accorded a sovereign with the broad qualification that such authority is held concurrently over all matters, including but not limited to the enforcement of traffic or criminal laws over

crimes and offenses committed within the National Parks, police powers, and taxes." United States Department of the Interior, *Notice of Acceptance of Cession and Retrocession,* received June 17, 1986 (acknowledging the action of the Maine legislature and completing the retrocession of concurrent jurisdiction over Acadia National Park).

in conjunction with federal action, the trial court had jurisdiction over defendant in this prosecution.

The entry is:

Judgment affirmed.

All concurring.