**STATE of Maine**

**v.**

**Ricardo CRUZ.**

Supreme Judicial Court of Maine.

Argued June 20, 1991.
Decided July 29, 1991.

Michael Carpenter, Atty. Gen., Phyllis Gardiner (orally), and Eric Wright, Asst. Attys. Gen., Augusta, for the State.

George Wood (orally), Wood & Van Houten and Kenneth I. Marass, Waterhouse, Titcomb, Marass, Flaherty & Knight, Sanford, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

McKUSICK, Chief Justice.

Defendant Ricardo Cruz appeals from his conviction of the knowing and intentional murder of Jessica Woodley, 17–A M.R.S.A. § 201(1)(A) (1983), following a jury trial in the Superior Court (York County, *Brodrick, J.*). Defendant argues that the trial court should have entered a judgment of acquittal on the ground that the State failed to establish *corpus delicti*, and that the trial court abused its discretion by admitting a belt in evidence and by failing to grant his request for a mistrial after an outburst made in the presence of the jury by a prosecution witness. Finding no merit to any of these contentions, we affirm.

In the summer of 1988 the victim was introduced to defendant by one of her friends. At that time the victim was a prostitute living in Old Orchard Beach and defendant was a drug dealer living in Portland with his wife, their child, and his wife's brother, Michael Ferrante. On Saturday evening, October 8, the victim, defendant, and Ferrante bought $250 worth of cocaine and went to the victim's apartment to use it. When the victim asked for more and defendant refused to give her any, the victim and defendant began to argue.

Ferrante went into the victim's bedroom to avoid being brought into the escalating dispute. After about 20 minutes, the victim came into her bedroom and told Ferrante to get out. He did, leaving his shoes there. When he went into the kitchen, he found defendant drinking beer at the table. Ferrante called a taxi company at 11:42 p.m., gave the dispatcher directions to the apartment, and went outside to wait for the cab. The cab never arrived. At about 12:30 a.m., Ferrante knocked on the door of the apartment and defendant let him in. Declining defendant's suggestion that he drive them both back to Portland in the victim's car, Ferrante fell asleep on the couch in the living room without seeing the victim again.

When Ferrante woke up on Sunday morning, defendant was writing in Spanish on the wall of the kitchen. When Ferrante tried to get his shoes from the bedroom, defendant would not let him go in, protesting that the victim was asleep and probably still angry. Defendant went by himself into the bedroom to get Ferrante's shoes. Before leaving for Portland in a cab with Ferrante, defendant placed some cocaine on the victim's kitchen table.

Back at his apartment, Ferrante called the Portland police, gave them the Old Orchard Beach address of the victim's apartment, and told them that someone might be hurt there. A Portland detective arrived at Ferrante's apartment to talk with him. From the window of the apartment Ferrante and the detective watched defendant pace up and down the street, take off his tee shirt, and head for a parking lot. A number of Portland police officers who had been observing defendant's odd behavior as well as the detective who had been interviewing Ferrante joined defendant there. According to the officers' later testimony, defendant was pointing to pictures of the victim that were taped to his abdomen and

gesturing with his fingers in a slicing motion across his throat. Defendant was taken to the police station for questioning. After his release later that day, defendant told at least five other people that he had strangled the victim.

As a result of Ferrante's phone call, the Old Orchard Beach police found the victim at about 10:10 a.m. on Sunday morning. When the officer arrived at the victim's apartment, he found her dead and lying faceup on the floor of her bedroom, with a denim garment tucked around her neck and covering her head. The officer also found a belt near the victim's head. The victim's clothing and the belt were sent to the autopsy.

Defendant was indicted for intentional or knowing murder in January 1989. Following a four-day trial the jury returned a guilty verdict within an hour.

## I.

At the autopsy the medical examiner's only significant finding was tiny pinpoint hemorrhages across the victim's face. The hemorrhages suggested to him that the victim had been asphyxiated by smothering or by manual or ligature strangulation, despite the absence of such usual signs of smothering or strangulation as laryngeal damage, skin marks, or signs of a struggle. Because his findings were inconclusive, the medical examiner was not prepared to specify a cause and manner of death until he tested for the presence of drugs in the victim's urine and blood. Those tests showed no poison and a nonlethal level of cocaine. From those tests, the medical examiner ruled out poisoning or cocaine overdose. At this point in his investigation, the medical examiner was told by the state police officer in charge of the case that defendant had admitted to others that he had strangled the victim. With this information, which was consistent with his own findings, the medical examiner declared the cause of death to be strangulation and the manner of death homicide.

■ Defendant argues that the trial court erred by permitting evidence of defendant's admissions to be heard by the jury before proof of *corpus delicti* and by failing to direct a judgment of acquittal on the ground that the State failed to prove *corpus delicti*. "[T]he *corpus delicti* rule requires the State, for its case to withstand the motion for acquittal, to have proved the fact of death of the victim and the criminal agency of another responsible therefor...." *State v. Libby*, 546 A.2d 444, 451 (Me.1988). The parties here stipulated that the dead person found in the victim's apartment was Jessica Woodley, thus leaving as the only *corpus delicti* issue whether her death was the result of a criminal agency.

In *State v. Curlew*, 459 A.2d 160, 162–65 (Me.1983), we set forth both the procedural and the substantive prongs of the *corpus delicti* rule, both of which are here implicated. The procedural prong of the rule leaves to the discretion of the trial court under M.R.Evid. 611(a) the determination of the order of proof of *corpus delicti*. The substantive prong of the rule, which has two parts, requires that the State

first, ... present evidence independent of the defendant's own statements adequate to prove both elements of *corpus delicti* to a probable cause standard and, second, ... present evidence, including any post-crime admissions or confessions made by the defendant adequate to establish the *corpus delicti* beyond a reasonable doubt.

*State v. Larson*, 577 A.2d 767, 770 (Me. 1990).

We reject defendant's contention that the judge erred in ruling on the order of proof. Before the trial began, counsel and the presiding justice met to discuss, among other issues, *corpus delicti*. In his offer of proof, the prosecutor told the presiding justice that he intended to present the case to the jury chronologically and he described the admissions of defendant that the jury would hear before it heard the medical examiner's testimony. Finally, the prosecutor explained that when the medical examiner testified, he would give his conclusions as to the manner of the victim's death without relying on any statements that were made by defendant. Over the objections of defense counsel, the presiding jus-

tice ruled that the prosecutor could present his case in that order, subject to satisfying the requirements of both parts of the substantive prong of the *corpus delicti* rule. In making his ruling, the justice emphasized that he would acquit defendant if the State's proof ultimately failed to satisfy fully the *corpus delicti* rule. The justice obviously ruled on the order of proof fully aware of the correct legal standard and we find no abuse of discretion.

■■■ Defendant's argument that the State failed to establish the substantive prong of the *corpus delicti* rule is similarly unavailing. Without relying on a defendant's admissions, the State must present evidence of *corpus delicti* to a probable cause standard. *See State v. Larson,* 577 A.2d at 770. Here the medical examiner testified that after the autopsy but before learning of defendant's admissions, he was able to rule out natural death or accidental or self-inflicted asphyxiation. The medical examiner also testified that once he received the results of laboratory tests of the victim's blood and urine, he was able to rule out a cocaine overdose or poisoning. Those conclusions, reached by the medical examiner before he learned of the admissions, together with the testimony of other witnesses about the position in which the victim's body was discovered, the presence of the denim garment tucked around the victim's head, and the location of the belt near her body, provided the court with sufficient support for its probable cause conclusion that the victim had died by a criminal agency. *See State v. Libby,* 546 A.2d at 451. Once the State had thus established *corpus delicti* to a probable cause standard without reliance on defendant's admissions, those admissions were appropriately considered by the court in determining whether the State at the close of its case had ultimately proved *corpus delicti* beyond a reasonable doubt. *See State v. Larson,* 577 A.2d at 770.

## II.

■■■ Among the items in evidence that supported the State's theory that defendant strangled the victim was the belt that the police found on the floor of the victim's apartment near her body. Because the medical examiner did not conclusively determine immediately that the victim had been·strangled, the police after the autopsy returned the belt to the victim's parents with her other personal effects instead of retaining the belt for further investigation. When the victim's mother on the stand could not identify State's Exhibit 2 as the belt given to her by a state police officer, the prosecutor at a bench conference asked the court for permission to call the victim's father to identify the belt. Because the State had not planned to call the victim's father, he had not been sequestered during his wife's testimony. Over defendant's objection, the court allowed the father to identify the belt as the one that had been given to him by the police in a box along with other items that had belonged to his daughter, but had been retrieved by the state police a few weeks later. He did so by putting the belt around his waist and testifying that he recognized it because he had previously worn the belt while it was in his possession.

■■■ We find no error in the court's allowing the father to testify though not sequestered. The decision to sequester a witness is a matter left to the sound discretion of the trial court. *See State v. Pickering,* 491 A.2d 560, 563 (Me.1985). Similarly, a trial court's decision to allow the testimony of an unsequestered witness is reviewed on an abuse of discretion standard. *Id.* Defendant does not show any actual prejudice resulting from the father's testimony that was directly related to his presence in the courtroom during his wife's testimony. The father's identification of the belt was in no way linked to the mother's failure to identify it; he told the jury that he knew that State's Exhibit 2 was the belt given to him by the state police because he had worn the belt while it was in his possession. Once the father identified the belt, it was authenticated as the belt found at the murder scene. *See* M.R.Evid. 901(a). Contrary to defendant's contention that M.R.Evid. 403 should have barred admission of the belt, even though relevant,

we find no error in the court's decision to admit the belt in evidence over defendant's general objection. With the belt properly identified, the court did not abuse its discretion by concluding that the belt's probative value was not substantially outweighed by any unfair prejudice. *See State v. Hurd,* 360 A.2d 525, 527 & n. 5 (Me.1976).

### III.

██ Roberto Gonzalez, a 29–year–old Portland resident, was one of the witnesses called by the State to relate defendant's admissions. Gonzalez testified that defendant had told him before the murder that the victim "probably will get killed" and admitted to him after the murder that he had killed the victim by putting poisoned cocaine in her beer. Gonzalez also testified that defendant told him that he had written in Spanish on the wall of the victim's apartment. When shown a picture of the writing, Gonzalez identified defendant's handwriting and gave a translation. During cross-examination, when defendant's counsel challenged the accuracy of the translation, Gonzalez lost his temper, accused defense counsel of trying to trick him, and refused to answer any more questions. At sidebar, defendant's counsel requested a mistrial. The presiding justice refused, but, with the assent of defendant's counsel, instructed the jury to disregard all of Gonzalez's testimony. Defendant neither objected to the instruction nor otherwise indicated that he was not satisfied with the court's disposition of the matter. But he argues here that the court's failure to declare a mistrial was obvious error. We disagree. The decision to declare a mistrial is left to the sound discretion of the trial court. *See State v. Hilton,* 431 A.2d 1296, 1302 (Me.1981). A curative instruction is adequate except "where there are exceptionally prejudicial circumstances or prosecutorial bad faith." *Id.* In the case at bar there is no suggestion of any prosecutorial bad faith and defendant has failed to show that he was prejudiced at all by Gonzalez's outburst.

The entry is:

Judgment affirmed.

All concurring.