2000 ME 89

**STATE of Maine**

v.

**David ANGLIN.**

Supreme Judicial Court of Maine.

Submitted on Briefs April 26, 2000.
Decided May 17, 2000.

Geoffrey A. Rushlau, District Attorney, F. Todd Lowell, Asst. Dist. Atty., Wiscasssett, for State.

Theodore K. Hoch, Bath, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

WATHEN, C.J.

[¶ 1] David Anglin appeals from a judgment entered in the Superior Court (Lincoln County, *Marsano, J.*) convicting him of operating under the influence in violation of 29–A M.R.S.A. § 2411(1) (1996).[1] On appeal, Anglin contends that the court erred in admitting evidence that he refused to answer police questions following the *Miranda* warning, that the court improperly admitted his statement that he had been drinking, and that the evidence was insufficient to support his conviction. Finding no error, we affirm the judgment.

[¶ 2] The relevant facts presented at trial may be summarized as follows: At around 11 p.m. on March 17, 1999, Robert

---

1. The statute provides, in pertinent part:

   1. Offense. A person commits OUI, which is a Class D crime unless otherwise provided, if that person operates a motor vehicle:

   A. While under the influence of intoxicants; or
   B. While having a blood-alcohol level of 0.08% or more.
29–A M.R.S.A. § 2411 (1996).

Blagden, a tow truck operator, retrieved a call from his answering machine about a car that had gone off the road in Dresden. Blagden recognized the caller as his niece, Sarah McDonald and, after determining that his services were still needed, drove his truck to her house. Once there, he discovered a car completely off the travel lane with one side down in the ditch. The road curved at that point; the car had left the road on the outside of that curve. Blagden did not know how long the message had been on his machine, nor how long the car had been off the road.

[¶ 3] David Anglin was waiting at the car when Blagden arrived and asked Blagden to tow the car to Richmond. The two men walked into the ditch to look at the car; as they did so, Anglin stumbled into Blagden. Blagden pointed out that Anglin had nearly hit a road sign; Anglin was not even aware a sign was there until Blagden pointed it out to him. Blagden wondered why Anglin wanted the car towed because the car was undamaged and could have been driven once it had been taken out of the ditch. Blagden turned his truck around to hitch and tow the car. As he did so, Anglin walked away, stopping about 50 yards down the road. At that point, Blagden called the Sheriff's Department because he was suspicious about Anglin's behavior.

[¶ 4] Blagden started to tow the car, but before it was out of the ditch, Anglin had walked back to the truck and asked Blagden to drive him, but not the car, to Richmond. Blagden refused. Anglin then said that he thought the road wasn't sanded properly and told Blagden that this was not the first time he had left the road on this curve. Anglin felt that the road was quite poorly maintained. All of these statements surprised Blagden. The road was perfectly clear, with no snow or ice; Blagden could see no reason why anyone would feel the road needed sand. Both Blagden and the two deputy sheriffs who later arrived on the scene testified that the roads were not slippery and did not pose

any difficulty for travel. Despite Anglin's statement about prior accidents on this curve, Blagden believed that Anglin was not sure where he was.

[¶ 5] Approximately five minutes after Blagden's call, Deputies Brian Collamore and Dan Sceviour of the Lincoln County Sheriff's Department arrived. Collamore interviewed Anglin and noticed that Anglin had difficulty getting his license out of his wallet, that his eyes were glassy and bloodshot, and that Anglin had alcohol on his breath. Sceviour noticed that Anglin's speech was slurred and that his eyes were bloodshot. Anglin admitted that he was operating the car that night and that he had two drinks with his dinner approximately two hours earlier. Collamore had Anglin perform a number of field sobriety tests, concluded that Anglin was operating under the influence, and arrested him. Once Anglin reached the station, Sceviour administered a breath test. This test, given after midnight, indicated that Anglin had a blood alcohol level of 0.16.

[¶ 6] Anglin was charged by complaint in the District Court with a violation of 29–A M.R.S.A. § 2411. The case was transferred to the Superior Court for a jury trial, but, once in that court, Anglin waived that right. Prior to trial, Anglin filed a motion in limine, arguing that certain statements he made to the police should not be admitted at trial. The motion was continued until trial. At trial, Anglin objected to the admission of his statement that he had had a couple of drinks before the police arrived at the accident. The court overruled the objection. Shortly thereafter, the State introduced testimony to the effect that Anglin had invoked his right to silence after Collamore had given him the *Miranda* warning. At the conclusion of the evidence, Anglin renewed his objection to the admission of this evidence and requested that the testimony be stricken or that the court declare a mistrial. The court denied Anglin's motions and, following closing argument by coun-

sel, found Anglin guilty.[2] Although the court concluded that the State had failed to prove that Anglin had been under the influence of intoxicants because it failed to show Anglin was impaired when he drove, the court concluded that the State had proved that Anglin had operated a vehicle "while having a blood alcohol of 0.08 percent or more." Anglin appeals from the judgment.

[¶ 7] Anglin's first argument on appeal attacks Deputy Collamore's reference to Anglin's silence after the *Miranda* warning. Ordinarily, the prosecution may not seek to use the defendant's invocation of the Fifth Amendment right to remain silent to create an inference of guilt. *See Griffin v. California*, 380 U.S. 609, 613, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This rule has been extended to instances in which the prosecution seeks to use a defendant's post-arrest, post-*Miranda* silence to impute guilt. *See Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Although *Griffin/Doyle* provide significant protection for defendants, these cases do not require reversal every time the prosecution comments upon a defendant's silence. The Supreme Court has distinguished between cases "[w]here the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, [and] where ... the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel ...." *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). There is no Fifth Amendment violation when the prosecution has made a "fair response" to a defendant's argument. *See id.; Amirault v.. Fair*, 968 F.2d 1404, 1406 (1st Cir.1992); *People v. Austin*, 23 Cal.App.4th 1596, 28 Cal.Rptr.2d 885, 895 (1994) ("It must be remembered [that] the defendant's right to remain silent is a shield. It cannot be used as a sword to cut off the prosecution's 'fair response' to the evidence or argument of the defendant."). Anglin challenges the State's question on re-direct: "So at some point did you consider asking him those questions?" Collamore's answer: "Right, but he refused to answer after he was given *Miranda*."

[¶ 8] When viewed in context, this is nothing more than the State's "fair response" to arguments initially made by Anglin's counsel. During the preceding cross-examination of Collamore, defense counsel deliberately questioned the thoroughness of Collamore's investigation by asking him: "Did you ask Mr. Anglin when his vehicle went into the ditch?" and "Did you ask Mr. Anglin whether he had any alcohol to drink after the vehicle went into the ditch?" In this context the State properly elicited the reference to Anglin's *Miranda* induced silence. Defense counsel opened the door for the State's questions and the court did not err in allowing the answer in evidence. *See State v. Ifill*, 574 A.2d 889, 891 (Me.1990) (defense counsel opened the door to evidence held inadmissible in a prior appeal).

[¶ 9] Anglin next argues that the State failed to meet its burden of proving *corpus delicti* and that therefore his admissions to Deputy Collamore regarding

---

**2.** Anglin had one previous OUI conviction within ten years, thus subjecting him to the minimum penalties in subsection (5)(B):

(1) A fine of not less than $600, except that if the person failed to submit to a test at the request of a law enforcement officer, a fine of not less than $800;

(2) A period of incarceration of not less than 7 days, except that if the person failed to submit to a test at the request of a law enforcement officer, a period of incarceration of not less than 12 days;

(3) A court-ordered suspension of a driver's license for a period of 18 months; and

(4) In accordance with section 2416, a court-ordered suspension of the person's right to register a motor vehicle ....

29–A M.R.S.A. § 2411(5)(B) (1996). Anglin was fined $600 and was sentenced to 10 days incarceration, "to be served at the Sagadahoc Second Offender Program." Anglin's license was also suspended for eighteen months.

his drinking were improperly admitted into evidence. The *corpus delicti* rule places an evidentiary burden upon the State to prevent convictions based solely upon the admissions of a defendant. *See State v. Chad B.*, 1998 ME 150, ¶ 6, 715 A.2d 144, 146. The State must "produce, exclusive of any confession or admission of the defendant, such credible evidence as will create a substantial belief that the crime charged has been committed by some person." [3] *State v. Curlew*, 459 A.2d 160, 165 (Me.1983). The substantial belief standard resembles the probable cause standard. *See State v. Michaud*, 1998 ME 251, ¶ 8, 724 A.2d 1222, 1227. "In the context of the *corpus delicti* rule, [p]robable cause exists where facts and circumstances within the [factfinder's] knowledge ... would warrant a prudent and cautious person to believe that someone committed the crime." *See id.* (alterations in original). The determination of whether the evidence was "sufficient to establish a substantial belief [that a crime occurred] is a question of law that we review *de novo.*" *Id.* ¶ 7, 724 A.2d at 1227.

[¶ 10] Anglin operated a vehicle that left the road at some point on March 17, 1999. The road was not slippery or dangerous to driving. When Anglin was tested, his blood alcohol content was twice the legal limit. This test followed a period of approximately an hour, during which he was under close observation and consumed no alcohol. These facts are sufficient to allow "a prudent and cautious person" to conclude that Anglin's blood alcohol content exceeded the legal limit at the time he drove his car off the road.

[¶ 11] Finally, Anglin's challenge to the sufficiency of the evidence to support his conviction is without merit.

---

**3.** After the first requirement is met, the State must prove beyond a reasonable doubt that someone committed the crime charged; in this endeavor, it may use the defendant's admissions. *See State v. Larson*, 577 A.2d 767, 770 (Me.1990). This, second, requirement in the *corpus delicti* rule is different from the general sufficiency of the evidence rule in that *corpus delicti* only requires proof that *some-one* committed the crime charged whereas the ·evidence is only sufficient for conviction if there is proof that the *defendant* committed the crime charged. *See id.* at 771; *State v. Buzzell*, 617 A.2d 1016, 1019–20 (Me.1992).