******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* PATRICK M.*
## (SC 20476)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crimes of murder and criminal possession of a firearm in connection with the death of his wife, Y, the defendant appealed to this court. The police had reported to the defendant's apartment, where he lived with Y and their two year old daughter, P, in response to a 911 call concerning a domestic disturbance. Upon entering the apartment, the police found the body of Y, who had died from multiple gunshot wounds to her head, as well as narcotics, packaging materials, and cash. The police thereafter located P in Brooklyn, New York, at the home of the defendant's sister, who indicated that the defendant had dropped off P the morning after Y's murder. The defendant was found in Massachusetts and arrested several days later. Following his arrest, the defendant was advised of and exercised his right to remain silent pursuant to *Miranda* v. *Arizona* (384 U.S. 436). Before trial, the state filed notice of its intent to introduce evidence of the defendant's uncharged misconduct, including the testimony of J, an ex-girlfriend of Y with whom Y had recently reunited, for the purpose of demonstrating the defendant's intent and identity. The defendant moved to exclude J's testimony, but the trial court ultimately concluded that it was relevant and not unduly prejudicial. At trial, J testified about two incidents that occurred a few months before Y's murder, when the defendant threatened J with a firearm at a funeral and when the defendant broke down the door to J's apartment while J and Y were in bed together. The state also elicited testimony from T, who was a drug runner for the defendant. T testified that he had been with the defendant in a car owned by T's mother on the day of Y's murder and that the defendant had texted the following morning asking him to look up "[h]ow much time do you get." The defendant testified in his own defense at trial. He admitted that he was a drug dealer and stated that, when he returned to his apartment on the night of the murder, he found Y dead and a large amount of cash and a certain quantity of heroin missing. The defendant claimed that he fled with P to his sister's home in Brooklyn because he feared the perpetrators of the purported robbery. He also testified that T picked him up in Brooklyn and drove him to New London, where he stayed for two days before going to Massachusetts. During closing arguments, which commenced later in the day on which the defendant testified, the prosecutor sought to cast doubt on the credibility of the defendant's testimony by emphasizing the defendant's delay in telling his version of events. The prosecutor repeated that "today" or "this morning" at trial was the "first time" the defendant had shared his story and argued that, if Y's murder was the result of a botched robbery, as the defendant claimed, common sense would have compelled the defendant to share that information with the police "closer to the time of the crime" in order to assist with the investigation. The prosecutor also stated during rebuttal argument that, in comparison to the months long delay it took J to report the incident at the funeral, "[t]here was a much bigger delay in hearing [from the defendant] about the missing large quantity of money." Defense counsel objected to the prosecutor's statements regarding the defendant's silence, but the court overruled the objection. After the defendant was found guilty, defense counsel moved for a new trial, claiming that the prosecutor had violated the defendant's right to due process by commenting on his post-*Miranda* silence. The court denied that motion, concluding that the prosecutor's statements referred to the defendant's prearrest silence, which is permissible. *Held*:

1. The evidence was sufficient to satisfy the state's burden of proving beyond a reasonable doubt that the defendant had committed the crimes of murder and criminal possession of a firearm: although there was no direct evidence linking the defendant to Y's murder, the cumulative impact of the circumstantial evidence was sufficient to support a reason-

able inference that it was the defendant who murdered Y with a firearm insofar as that evidence revealed that his marriage with Y was disintegrating due to his own extramarital affairs and Y's romantic relationship with J, that the defendant previously had threatened to kill Y and had threatened J with a gun, and, therefore, that the defendant had a motive to murder Y and had expressed a willingness to take action consistent with that motive; moreover, the defendant's own testimony placed him at the scene of the murder less than one hour before the 911 call, the trier of fact was not required to credit the defendant's testimony that Y was dead when he arrived at the apartment, particularly because it was inconsistent with the timeline of events established by the 911 call and certain video surveillance footage that was admitted at trial, and it was undisputed that the defendant was a drug dealer who routinely possessed large quantities of cash and narcotics, which permitted a reasonable inference that the defendant possessed a firearm and had the means and opportunity to kill Y with such a weapon; furthermore, the defendant's flight from the scene of Y's murder without calling the police or seeking medical assistance for Y, certain incriminatory statements that he made indicating that he was "sorry" and "on the run," as well as his inquiry to T regarding "[h]ow much time do you get," constituted indirect evidence of the defendant's guilt.

2. The prosecutor improperly commented on the defendant's post-*Miranda* silence, in violation of the defendant's due process right to a fair trial, and, accordingly, the judgment of conviction was reversed, and the case was remanded for a new trial: the state conceded that the prosecutor's comment during rebuttal argument regarding the significant "delay in hearing [from the defendant] about the missing large quantity of money" was improper because its context revealed that it referred both to the defendant's pre-*Miranda* and post-*Miranda* silence, and the prosecutor's other references to the defendant's silence during closing argument were ambiguous because they referred generally to the defendant's delay in disclosing his version of events and could reasonably have been understood to include both the four days of pre-*Miranda* silence between the murder and the defendant's arrest and the lengthier post-*Miranda* period between his arrest and trial; moreover, this court adopted a contextualized approach for the purpose of construing such ambiguous prosecutorial remarks, pursuant to which the court must analyze whether the language used by the prosecutor was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the defendant's post-*Miranda* silence, and pursuant to which the defendant bears the initial burden of proving an impermissible comment on his post-*Miranda* silence, after which the state bears the burden of demonstrating that the error was harmless beyond a reasonable doubt; in the present case, viewing the prosecutor's remarks in the context in which they were made, the jury naturally and necessarily would have construed them to refer to both the defendant's pre-*Miranda* silence, insofar as the comments focused on the defendant's flight to Brooklyn, New London, and Massachusetts before his arrest, and his post-*Miranda* silence, insofar as the prosecutor repeatedly emphasized that "today" or "this morning" was the "first time" the defendant told his story; furthermore, the prosecutor emphasized the recent nature of the defendant's disclosure by arguing that the police had not investigated Y's death as a botched robbery because, between the date of the murder and the date the defendant testified, he never informed the police that a robbery occurred, and, thus, the prosecutor's remarks encompassed the full continuum of the defendant's pre-*Miranda* and post-*Miranda* silence, and the natural and necessary impact of the prosecutor's statements during initial closing argument was reinforced by the admittedly improper comment during rebuttal argument when the prosecutor expressly noted that the defendant's silence far exceeded four months; in addition, the state failed to satisfy its burden of demonstrating that the prosecutor's improper remarks were harmless, as it failed to explain how the prosecutor's repeated emphasis on the defendant's post-*Miranda* silence during initial closing argument, which struck at the jugular of the defendant's testimony that Y was killed during a botched robbery, was harmless beyond a reasonable doubt.

3. The trial court did not abuse its discretion in admitting J's testimony regarding the funeral incident as evidence of the defendant's uncharged misconduct on the ground that the probative value of that evidence

outweighed its prejudicial effect: J's testimony regarding her relationship with Y and the defendant's threatening conduct clearly was relevant to the issue of the defendant's motive to commit the crimes of conviction, as the jury reasonably could have found that the defendant blamed the breakdown of his marriage on Y's relationship with J, that he was willing to resort to violence to end their relationship, and that his willingness to use violence extended to Y herself, especially in light of evidence that the defendant had threatened to kill Y and that Y had called the police after the defendant burst in on her and J in bed together; moreover, the uncharged misconduct evidence was not unduly prejudicial, as the defendant's threatening conduct toward J at the funeral was less severe than the conduct that formed the basis for his conviction of Y's murder and, therefore, was unlikely to unduly arouse the emotions of the jurors; furthermore, the trial court instructed the jury that its use of J's testimony regarding the funeral incident was limited to showing or establishing the motive for the commission of the charged crimes, which minimized any prejudicial effect that the evidence otherwise may have had.

Argued May 5—officially released September 2, 2022**

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Britain, where the charge of murder was tried to the jury before *Oliver, J.*; verdict of guilty; thereafter, the charge of criminal possession of a firearm was tried to the court, *Oliver, J.*; finding of guilty; judgment of guilty in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Reversed*; *new trial.*

*Emily H. Wagner*, assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Brett J. Salafia*, executive assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. The defendant, Patrick M., was convicted of murder in violation of General Statutes § 53a-54a (a) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) in connection with the death of his wife, Y. On appeal, the defendant raises four claims: (1) the evidence was insufficient to establish his identity as the perpetrator of the crimes of conviction; (2) the prosecutor violated the proscriptions set forth in *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), by improperly commenting on the defendant's invocation of his right to remain silent following his arrest and advisement of rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (3) the prosecutor's comments during closing argument on the defendant's post-*Miranda* silence and pretrial incarceration constituted prosecutorial improprieties that deprived the defendant of his due process right to a fair trial; and (4) the trial court improperly admitted evidence of the defendant's prior uncharged misconduct in violation of our rules of evidence. We conclude that the evidence was sufficient to support the defendant's conviction but that the prosecutor improperly commented on the defendant's post-*Miranda* silence. We therefore reverse the conviction and remand the case for a new trial.

The jury reasonably could have found the following facts. The defendant and Y were married in 2015 and had one child together, P. Their relationship was tumultuous and plagued by infidelity. The defendant had a series of extramarital affairs with various women, and, by 2017, Y was in a sexual relationship with her former girlfriend, Kye Jones. The defendant, who did not approve of Y and Jones' relationship, at one point threatened to kill Y[1] and, on a different occasion, also threatened Jones with a gun, yelling at her, "I told you I ain't no punk."

On April 7, 2017, the defendant, Y, and P, who was two years old at the time, lived in a second floor apartment in New Britain. Their neighbor, M, lived in the apartment directly below them. On the night of April 7, M arrived home at approximately 9 p.m. Less than an hour later, M heard "a lot of ruckus coming from upstairs," which she characterized as fighting, yelling, and bodies being tossed around. M called 911, and the police arrived shortly thereafter, at 10:05 p.m.

The police knocked on the locked door of Y's apartment, but there was no answer. After speaking to M, the police decided to force entry into the apartment. Inside, they found Y in the master bedroom face down in a pool of blood. Attempts to revive Y were unsuccessful, and she was pronounced dead at the scene. A subsequent autopsy revealed the cause of Y's death to be multiple gunshot wounds to the head and that the man-

ner of her death was a homicide.[2]

The police searched the apartment, but neither the child nor anyone else was there. Inside the master bedroom, the police discovered multiple nine millimeter shell casings and bullet fragments. There also was evidence of a struggle: a blood like substance was found on the bed, and Y was wearing only one shoe. The search also resulted in the seizure of multiple cell phones, narcotics, packaging materials, and approximately $2900 in cash.

Given the nature of the initial 911 call as a domestic disturbance, the police focused their efforts on locating the defendant and P. When those efforts yielded no results, an Amber Alert was issued, insofar as P was "a missing child [who was] in danger because there was a homicide." The Amber Alert also warned that the defendant was "considered dangerous" and should be approached with "extreme caution." The police later located P at the home of the defendant's sister in Brooklyn, New York. The defendant's sister informed the police that the defendant had stopped by unannounced on the morning of April 8, 2017, and told her to "take care of [his] daughter." On that same date, the defendant also called Y's aunt and said to her, "I love you. . . . I'm sorry. I'm on the run."

The defendant was found on April 11, 2017, in Massachusetts. He was arrested and charged with murder and criminal possession of a firearm. The defendant elected a jury trial on the murder charge and a bench trial on the criminal possession of a firearm charge.

At trial, the jury heard testimony from Dwayne Watson, who was familiar with the defendant through Y's sister, with whom he had a child. Watson testified that he saw the defendant on the afternoon of April 7, 2017, picking up P after school in a gray Chevrolet Malibu. Watson also saw the defendant later that evening in Hartford in the same gray vehicle. The jury also heard testimony from Daniel Thomas, an associate of the defendant's. Thomas testified that he went with the defendant to pick up P after school on the afternoon of the day of the murder in a silver Chevrolet Malibu, which was registered and insured in the name of Thomas' mother. Thomas spent a couple of hours with the defendant and P and then went home.

Later that night, Thomas learned that Y had been shot and killed. Thomas subsequently received a phone call from the defendant, in which the defendant asked him "what was going on out there." Thomas responded that "people [were] saying that you killed your girl," and the defendant replied, "for real? That's what they saying?" The defendant also said that "he probably wasn't going to see his daughter."

The defendant texted Thomas again during the early morning hours the following day and asked him to look

up "[h]ow much time do you get." Thomas told the defendant to park the Chevrolet Malibu and to "take the plates off so [his] mother won't be a part of [a criminal investigation]." The defendant asked Thomas to pick up the car in Brooklyn. Thomas drove to Brooklyn, where he and a friend picked up the Chevrolet Malibu and the defendant's cell phone. They delivered the Chevrolet Malibu to the home of Thomas' mother, but Thomas kept the cell phone in his possession. On cross-examination, Thomas admitted that he currently was incarcerated as a result of a conviction for the sale of narcotics and that, prior to his incarceration, he was "a drug runner" for the defendant. He explained that he kept the defendant's cell "phone because [he] wanted to wrap up any loose ends [regarding] drug deals."

The state adduced video surveillance footage showing a vehicle matching the description of the gray Chevrolet Malibu driving through an intersection near Y's apartment at approximately 10 p.m. on the day of the murder. Additionally, cameras operated by the city of New York captured images of the Chevrolet Malibu's license plate in various areas of New York a few hours later, between 1 and 2:30 a.m. on April 8, 2017.

The defendant testified in his own defense. The defendant admitted that he was a drug dealer and a convicted felon. He explained that, as a drug dealer, he drove many cars, one of which was the Chevrolet Malibu owned by Thomas' mother. The defendant testified that, on the afternoon of April 7, 2017, he drove the Chevrolet Malibu to pick up his daughter from school at approximately 3 p.m. Thomas accompanied the defendant and returned with him and P to the apartment in New Britain for two or three hours. Sometime thereafter, the defendant left the apartment with P to go to Hartford to purchase "some weed." According to the defendant, he did not drive the Chevrolet Malibu to Hartford. Instead, he drove a blue Acura because he "needed to bring money to New York" and the Acura "had a stash box," or "a hidden compartment under the seat."

The defendant testified that he returned to his New Britain apartment with P at approximately 9 p.m. He noticed that Y's truck was parked in the parking lot and that the door to his apartment was open. When the defendant entered the apartment, he realized that a large amount of cash and illicit drugs were missing. The defendant placed P on the couch and searched the apartment. In the master bedroom, he found Y dead on the floor. In panic and fear, the defendant "grabbed [P] and ran out the door" of the apartment. In order to "[get P] to safety," the defendant fled in the blue Acura to his sister's home in New York.

According to the defendant, he received a phone call from Thomas on the way to New York, in which Thomas informed him that "[his] wife got killed and they saying [that he] did it." The defendant also received notice of

the Amber Alert, which described him as "[a]rmed and dangerous . . . ." Because he was a suspect in Y's murder, the defendant was afraid to contact the police. Instead, he dropped P off at his sister's house and arranged to have Thomas pick him up in Brooklyn. Thomas arrived to pick him up in the Chevrolet Malibu and then drove the defendant to a girlfriend's house in New London. The defendant stayed in New London for two days, after which Thomas drove him to Massachusetts in the Chevrolet Malibu. The police arrested the defendant in Massachusetts one and one-half days later.

On the basis of the foregoing evidence, the jury found the defendant guilty of murder, and the trial court found the defendant guilty of criminal possession of a firearm. The trial court rendered judgment in accordance with the jury's verdict and the court's finding, and sentenced the defendant to fifty-five years of incarceration.[3] This direct appeal followed.

I

The defendant first claims that the evidence was insufficient to support his conviction because the state failed to prove the essential element of identity. We disagree.

"[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve. . . . To determine whether the evidence was sufficient to establish the essential element of identity, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Abraham*, 343 Conn. 470, 476, 274 A.3d 849 (2022).

In view of these principles, it is readily apparent that the evidence was sufficient to support a reasonable inference that the defendant committed the crimes of murder and criminal possession of a firearm. The evidence at trial revealed that the defendant's marriage with Y was disintegrating due to the defendant's extramarital affairs and Y's romantic relationship with Jones. As their marriage unraveled, the defendant threatened to kill Y and threatened Jones with a gun. The defendant had a motive to murder Y and had expressed a willingness to take action consistent with that motive. See id., 479 (although motive is not essential element of murder,

"the existence or absence of motive often is used at trial to construct a narrative of guilt or innocence"); see also part III of this opinion.

The defendant also had the opportunity and means to commit the crimes with which he was charged. The defendant's own testimony placed him at the scene of the murder at approximately 9 p.m., less than one hour before the 911 call complaining of fighting, yelling, and bodies being tossed around inside the apartment. Although the defendant testified that Y was dead when he arrived at the apartment, the triers of fact were not required to credit the defendant's testimony, particularly because it was inconsistent with the timeline of events established by the 911 call and the video surveillance footage, which depicted the Chevrolet Malibu driven by the defendant earlier in the day leaving the area at 10 p.m. See, e.g., *State* v. *Roy D. L.*, 339 Conn. 820, 849, 262 A.3d 712 (2021) ("[I]t is well established that [w]e may not substitute our judgment for that of the [finder of fact] when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the [finder] of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.)).

The defendant also had the means to commit the crimes because there was evidence from which the jury reasonably could have found that he had access to a firearm. It was undisputed that the defendant was a drug dealer who routinely possessed large quantities of cash and narcotics. "Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms . . . ." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 240, 249 A.3d 683 (2020). "The jury is permitted to rely on its common sense, experience and knowledge of human nature in drawing inferences . . . and may draw factual inferences on the basis of already inferred facts." (Citation omitted; internal quotation marks omitted.) Id.; see *United States* v. *White*, 356 F.3d 865, 870 (8th Cir. 2004) ("[w]e allow a [fact finder] to infer a connection between drugs and firearms when a defendant distributes quantities of illegal drugs because firearms are viewed as a tool of the trade for drug dealers"). Thus, the jury and the trial court reasonably could have inferred that the defendant had the means to kill Y with a firearm.

Lastly, following the murder, the defendant did not call the police or summon emergency medical assistance to treat Y's grievous injuries; instead, he fled the apartment and was found four days later out of state. Under certain circumstances, "[f]light, when unexplained, tends to prove a consciousness of guilt. . . .

The flight of the person accused of a crime is a circumstance [that], when considered together with all the facts of the case, may justify an inference of the accused's guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Rosa*, 170 Conn. 417, 432–33, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). The defendant's flight from the scene of Y's murder, coupled with his incriminatory statements that he was "sorry" and "on the run," as well as his inquiry into "[h]ow much time do you get," constituted indirect evidence of the defendant's guilt. See *State* v. *McClain*, 324 Conn. 802, 819, 155 A.3d 209 (2017) (consciousness of guilt is "indirect evidence of the defendant's guilt"); *State* v. *Groomes*, 232 Conn. 455, 474, 656 A.2d 646 (1995) (jury may use consciousness of guilt evidence "as independent evidence of guilt *along with the other facts of the case* to determine whether . . . [the defendant] has been proven guilty" (emphasis in original; internal quotation marks omitted)).

We recognize that there was no direct evidence, such as eyewitness testimony, or physical evidence, such as DNA, linking the defendant to Y's murder. The absence of such evidence, however, does not preclude a finding of guilt on the basis of circumstantial evidence that satisfies the constitutional standard. As we previously have explained, "[w]hen reviewing the sufficiency of the evidence, we must focus on the evidence presented, not the evidence that the state failed to present . . . . Additionally, we do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned . . . . Indeed, [c]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence. . . . It is not one fact . . . but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Abraham*, supra, 343 Conn. 477. On the basis of our review of the record, we conclude that the cumulative impact of the circumstantial evidence was sufficient to satisfy the state's burden of proving beyond a reasonable doubt that it was the defendant who murdered Y with a firearm.

## II

The defendant contends that he was deprived of his due process right to a fair trial because the prosecutor repeatedly commented on his post-*Miranda* silence during closing argument, in violation of *Doyle* v. *Ohio*, supra, 426 U.S. 610.[4] The following additional facts are relevant to this claim. The defendant was arrested four days after the murder, on April 11, 2017, at which time he was advised of his right to remain silent pursuant to *Miranda* v. *Arizona*, supra, 384 U.S. 478–79. Following his arrest, the defendant exercised his right to remain silent.

At trial, the defendant broke his silence and testified in his own defense as to what occurred on the night of April 7, 2017. The defendant explained that he arrived at his New Britain apartment at approximately 9 p.m. to find Y dead and $83,000 in cash and 600 grams of heroin missing. The defendant was afraid, so he grabbed his daughter, P, and fled with her to New York, where he dropped her off at his sister's house. The defendant's testimony raised the possibility that Y had been killed in a robbery gone wrong and that his flight was prompted by fear of the perpetrators rather than his own guilt.

During closing argument, the prosecutor repeatedly sought to cast doubt on the credibility of the defendant's testimony by emphasizing the defendant's delay in telling his story. The prosecutor first invoked this theme, i.e., the belated timing of the defendant's disclosure, by arguing: "Now, the defendant told you today [that] his fear [was] the reason for taking the child to New York. Considering your common sense, would it be reasonable to tell your close family about the event? *I submit to you* [*that*] *the first time we're hearing anything about this sequence of events or the basis was this morning through* [*the defendant's*] *testimony.*" (Emphasis added.) The prosecutor asked the jury whether the defendant's "reaction, this fear reaction and the actions that [the defendant] testified to you today that he took, does that fit your commonsense view of how a parent would behave in the wake of the violent death of [his] spouse, or would that parent be taking every step possible to comfort, to shield [P] from what had just happened, and to try very hard, if there were an alternative theory, and I submit to you that there isn't . . . to make sure that that theory was properly investigated? But [the defendant] didn't do that." Instead, he "went to New London, and he hung out with some woman for a couple days," and then went to Massachusetts.

The prosecutor soon returned to the theme that the version of events to which the defendant testified at trial was a recent fabrication: "Now, today you heard *for the first time* about this subsequent meeting where [the defendant] goes to Hartford to see . . . Thomas, gets some marijuana, change[s] cars, get[s] the car that has the trap set up in it so that he could secure the money for the ride down to New York.

* * *

"Now, *this morning you hear about* the trip to New London, you hear about the ultimate trip to Massachusetts to the friend's relative's house, and you hear, *for the first time this morning*, the mention of this large quantity of drug money. The follow-up trip to Hartford *is the first time you heard about that this morning*. And common sense would show you that this information, closer to the time of the crime, might be important

to direct the investigation." (Emphasis added.)

The prosecutor also argued that the defendant "can't really have it both ways"; he cannot criticize the police for their failure to investigate a robbery while at the same time refus[e] to disclose that a robbery occurred. "*If* [*the police*] *had information closer to the time of this incident that this was a robbery* involving a very large quantity, essentially more than most people's annual income was on this kitchen table, if you're to believe that, the police probably would have changed the tactics that they used to investigate this crime. We'll never know because they didn't know that because *the first time you heard about it was this morning.*" (Emphasis added.)

During his closing argument, defense counsel pointed out alleged deficiencies in the investigation of Y's murder and questioned the credibility of Jones' testimony, in part because she waited four months after the defendant threatened her with a gun to come forward and "finally [tell] her story." In response, the prosecutor stated in rebuttal argument that "there's an old saying, 'what's good for the goose is good for the gander.' Counsel commented about the four month . . . delay in . . . Jones' statement. That's just what it is . . . that's when the interview took place. *There was a much bigger delay in hearing* [*from the defendant*] *about the missing large quantity of money.*" (Emphasis added.)

Following closing argument and the excusal of the jury, defense counsel objected to the prosecutor's statements that the defendant's "silen[ce] can be used against him." The trial court overruled defense counsel's objection, concluding that, "as phrased—and I was cognizant of the twice that was done was not in the context of telling a certain story—it was refined. It was used once, and then again on rebuttal. That is noted." The court explained that commentary on a defendant's silence has "been deemed improper . . . [when] it was phrased in terms of what the defendant could have told the police, that sort of thing, and when. That was not the case here . . . ."

After the defendant was found guilty, defense counsel filed a motion for a new trial, claiming in relevant part that the prosecutor had violated the defendant's constitutional rights pursuant to *Doyle* v. *Ohio,* supra, 426 U.S. 610, by commenting on the defendant's post-*Miranda* silence and "highlighting that [the defendant's] exculpatory story was told for the first time at trial." The trial court denied the motion, concluding that the prosecutor's statements "did not specifically involve comment on the defendant's postarrest silence, as opposed to [his] prearrest silence, which is allowed . . . ."

On appeal, the defendant renews his claim that he was deprived of his due process right to a fair trial by the prosecutor's commentary on his post-*Miranda*

silence. The state concedes that the prosecutor's rebuttal comment that "[t]here was a much bigger delay in hearing about the missing large quantity of money" was improper under *Doyle* because the context of that statement reveals that it referred both to the defendant's pre-*Miranda* and post-*Miranda* silence. The state maintains, however, that this improper comment was harmless beyond a reasonable doubt and contends that the prosecutor's other comments during initial closing argument did not violate *Doyle* because they focused solely on the defendant's pre-*Miranda* silence.

We begin our analysis with *Doyle* v. *Ohio*, supra, 426 U.S. 611, in which the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. As we have previously recognized, the holding in *Doyle* was based on two considerations: "First, [*Doyle*] noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that [although] it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."[5] (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 523, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005). Use of a defendant's *pre-Miranda* silence, by contrast, does not raise the same constitutional concerns: "evidence of prearrest, and specifically pre-*Miranda*, silence is admissible to impeach the testimony of a defendant who testifies at trial, since the rule of *Doyle* v. *Ohio*, supra, [619], is predicated on the defendant's reliance on the implicit promise of *Miranda* warnings." *State* v. *Angel T.*, 292 Conn. 262, 286 n.19, 973 A.2d 1207 (2009); see *Jenkins* v. *Anderson*, 447 U.S. 231, 240, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (if "[t]he failure to speak occurred before the [defendant] was taken into custody and given *Miranda* warnings . . . [then] the fundamental unfairness present in *Doyle* is not [implicated]," and "impeachment by use of prearrest silence does not violate the [f]ourteenth [a]mendment").[6]

To resolve the issue presented on appeal, we must determine whether the prosecutor permissibly commented on the defendant's pre-*Miranda* silence or impermissibly and unconstitutionally commented on the defendant's post-*Miranda* silence. The defendant argues that the prosecutor's challenged remarks plainly referred to his post-*Miranda* silence because the prosecutor repeatedly emphasized that the defendant's in-court testimony, which occurred more than two years after his arrest, was the "first time" that he had disclosed

his exculpatory story. The state disagrees and argues that the context of the prosecutor's challenged remarks reveal that they referred to the defendant's pre-*Miranda* silence because the prosecutor "focused on what the defendant could have told the police before he was arrested." We conclude that the prosecutor's references to the defendant's silence were ambiguous because they were not confined to a defined point in time within the pre-*Miranda* period but, instead, referred generally to the defendant's delay in disclosing his version of events without limitation. That delay, when referenced by the prosecutor in an unspecified and, therefore, unrestricted manner, could reasonably have been understood to include both the four days of pre-*Miranda* silence and the much lengthier period between the defendant's arrest and his trial. This fact makes the prosecutor's comments ambiguous. See, e.g., *State* v. *Courtney G.*, 339 Conn. 328, 345–46, 260 A.3d 1152 (2021) (recognizing that prosecutorial statements are ambiguous if their meaning is unclear and susceptible to more than one reasonable interpretation).

We have not previously addressed how to construe ambiguous prosecutorial remarks that reasonably can be interpreted to refer either to a defendant's pre-*Miranda* or post-*Miranda* silence. Some courts hold that "general references . . . to a defendant's silence" that encompass both "a pre-*Miranda* and post-*Miranda* [time frame]" necessarily violate a defendant's right to a fair trial, reasoning that prosecutors should not be allowed "to sidestep the *Doyle* protections by skirting the edge of the law with vague and imprecise references to a defendant's silence." *State* v. *Lofquest*, 227 Neb. 567, 570, 418 N.W.2d 595 (1988); see *United States* v. *Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) ("[a] prosecution closing argument that broadly condemn[s] [the defendant's] silence . . . pre-*Miranda* and post-*Miranda* violate[s] due process" (internal quotation marks omitted)), cert. denied, 552 U.S. 1129, 128 S. Ct. 950, 169 L. Ed. 2d 782 (2008); *United States ex rel. Allen* v. *Franzen*, 659 F.2d 745, 748 (7th Cir. 1981) ("the prosecutor's remarks were phrased broadly, without distinguishing between pre- and [postarrest] silence," and, "[t]herefore, the fact that the questions may have permissibly referred in part to the [prearrest] silence does not alter the conclusion that the references to [postarrest] silence were unconstitutional"), cert. denied sub nom. *Lane* v. *Allen*, 456 U.S. 928, 102 S. Ct. 1975, 72 L. Ed. 2d 444 (1982).

Other courts take a more contextualized approach, inquiring "whether the manifest intent was to comment on the defendant's [post-*Miranda*] silence or, alternatively, whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's [post-*Miranda*] silence." (Internal quotation marks omitted.) *United States* v. *Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993); see

*United States* v. *May*, 52 F.3d 885, 890 (10th Cir. 1995) ("[T]he test for determining if there has been an impermissible comment on a defendant's right to remain silent at the time of his arrest is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent. . . . The court must look to the context in which the statement was made in order to determine the manifest intention [that] prompted it and its natural and necessary impact on the jury." (Internal quotation marks omitted.)); *United States* v. *Ramos*, 932 F.2d 611, 616 (7th Cir. 1991) (to establish *Doyle* violation, defendant must prove that "it was the prosecutor's manifest intention to refer to the defendant's silence" or that "the remark was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's silence" (internal quotation marks omitted)); *United States* v. *Rosenthal*, 793 F.2d 1214, 1243 (11th Cir. 1986) ("[a] comment is deemed to be a reference to a defendant's silence if either . . . (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or (2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on [the] defendant's silence"), cert. denied, 480 U.S. 919, 107 S. Ct. 1377, 94 L. Ed. 2d 692 (1987), and cert. denied sub nom. *Stewart* v. *United States*, 480 U.S. 919, 107 S. Ct. 1377, 94 L. Ed. 2d 692 (1987), and cert. denied sub nom. *Junker* v. *United States*, 480 U.S. 919, 107 S. Ct. 1377, 94 L. Ed. 2d 692 (1987). Under this approach, "[b]oth the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant." (Internal quotation marks omitted.) *United States* v. *Laury*, supra, 1303. "The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation." *United States* v. *Rosenthal*, supra, 1243.

We adopt the contextualized approach for two reasons. First, this approach is consistent with our case law, which evaluates a prosecutor's remarks or questions in context to determine whether a *Doyle* violation occurred. See, e.g., *State* v. *Jeffrey*, 220 Conn. 698, 721, 601 A.2d 993 (1991) (concluding that no *Doyle* violation occurred because "[t]he state's line of inquiry leading up to [the challenged] question concerned the defendant's conduct when the police arrived at his home *before they placed him under arrest*" (emphasis in original)), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); *State* v. *Devito*, 159 Conn. App. 560, 572, 124 A.3d 14 (concluding that no *Doyle* violation occurred because, "[g]iven the context in which the question was asked . . . it is more probable that it would have been understood to refer to the defendant's prearrest silence"), cert. denied, 319 Conn. 947, 125

A.3d 1012 (2015).

Second, we consistently have applied the naturally and necessarily test to determine whether a prosecutor's ambiguous references to a defendant's failure to testify violate a criminal defendant's constitutional right against self-incrimination. See, e.g., *State* v. *Jose R.*, 338 Conn. 375, 389, 258 A.3d 50 (2021) ("[w]hen it is unclear whether the prosecutor's comments at issue referred to the defendant's failure to testify, a reviewing court appl[ies] what is known as the naturally and necessarily test to determine whether a fifth amendment violation occurred" (internal quotation marks omitted)); *State* v. *A. M.*, 324 Conn. 190, 202, 152 A.3d 49 (2016) ("[t]he 'naturally and necessarily' standard applies only when it is unclear whether the prosecutor's comments at issue referred to the defendant's failure to testify"); *State* v. *Lemon*, 248 Conn. 652, 660, 731 A.2d 271 (1999) ("we consistently have applied the 'naturally and necessarily' test in resolving claims of improper prosecutorial comment on the defendant's failure to testify"). We can perceive no reason to treat ambiguous references to a defendant's post-*Miranda* silence differently from ambiguous references to a defendant's silence at trial. See, e.g., *United States* v. *Mora*, 845 F.2d 233, 235 (10th Cir.) (observing that naturally and necessarily test "is the same test employed for the analogous situation of prosecutorial commentary on a defendant's failure to testify at trial"), cert. denied, 488 U.S. 995, 109 S. Ct. 562, 102 L. Ed. 2d 587 (1988); *United States ex rel. Smith* v. *Rowe*, 618 F.2d 1204, 1210 (7th Cir.) ("we see no reason why the same standard should not be equally applicable" to determine "when ambiguous prosecutorial comments will constitute an invasion of the defendant's right to remain silent after his arrest" and when they will "constitute impermissible comment [on] the defendant's failure to testify at trial"), vacated on other grounds sub nom. *Franzen* v. *Smith*, 449 U.S. 810, 101 S. Ct. 57, 66 L. Ed. 2d 13 (1980).

Accordingly, to determine whether a *Doyle* violation occurred in the present case, we must analyze "whether the language used [by the prosecutor was] manifestly intended to be, or was . . . of such a character that the jury would *naturally and necessarily* take it to be a comment on the [defendant's post-*Miranda* silence]. . . . [I]n applying this test, we must look to the context in which the statement was made in order to determine the manifest intention [that] prompted it and its natural and necessary impact [on] the jury." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Jose R.*, supra, 338 Conn. 389. The defendant bears the burden of proving that a *Doyle* violation occurred. See, e.g., *United States* v. *Laury*, supra, 985 F.2d 1303; see also *State* v. *Reddick*, 174 Conn. App. 536, 556, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied,    U.S.   , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018). If the defendant fulfills

his burden, then "the state assumes the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt." *State* v. *Reddick*, supra, 556.

We need not decide whether the prosecutor's ambiguous remarks were manifestly intended to refer to the defendant's post-*Miranda* silence because, viewing the remarks in the context in which they were made, we conclude that the jury naturally and necessarily would have construed them to refer *both* to the defendant's pre-*Miranda and* post-*Miranda* silence. To be sure, some of the prosecutor's challenged remarks focused on the defendant's conduct during the four day time period between the commission of the crimes and the defendant's arrest, namely, the defendant's flight to New York with P, subsequent trip to New London, and ultimate journey to Massachusetts. The prosecutor argued that the defendant's pre-*Miranda* conduct was indicative of his consciousness of guilt and asked the jury to infer, on the basis of its common sense, that an innocent person would not have fled but, instead, would have notified his family and the authorities of Y's death to "make sure that [it] was properly investigated." To the extent that the natural and necessary meaning of these remarks was directed at the defendant's pre-*Miranda* silence, they were permissible.

But some of the prosecutor's comments, specifically the ones that emphasized that "today" or "this morning" was the "first time" that the defendant told his story, naturally and necessarily would have been construed by the jury as commentary on the defendant's post-*Miranda* silence. This conclusion is compelled by the repeated, unmistakable emphasis that the prosecutor placed on the recency of the defendant's disclosure of his exculpatory version of events. The prosecutor emphasized that the defendant failed to disclose his exculpatory story until the time of trial, repeatedly pointing out that "today" or "this morning," during the defendant's in-court testimony, was "the *first time* we're hearing anything about this sequence of events . . . ." See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 83, 86, 901 A.2d 1 (2006) (*Doyle* violation occurred when prosecutor asked defendant, " 'when is the first time that you told someone in authority, like a judge, a prosecutor or a police officer, this story about your sweatpants being dipped in blood,' " and "the defendant responded that he had provided that version of the events for the first time 'in this courtroom' "), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007); *State* v. *Boone*, 15 Conn. App. 34, 44, 544 A.2d 217 (*Doyle* violation occurred when prosecutor asked "the defendant, '[y]ou never told anyone what happened until today in court,' " and commented during closing argument that " '[the defendant] never gave a statement' "), cert. denied, 209 Conn. 811, 550 A.2d 1084 (1988). The prosecutor emphasized the recent nature

of the defendant's disclosure, arguing that "common sense would show you that this information, *closer to the time of the crime*, might be important to direct the investigation." (Emphasis added.) The prosecutor highlighted that, "[i]f [the police] had information *closer to the time of this incident* that this was a robbery involving a very large quantity, essentially more than most people's annual income was on this kitchen table, if you're to believe that, the police probably would have changed the tactics that they used to investigate this crime. We'll never know because *they didn't know that because the first time you heard about it was this morning.*" (Emphasis added.) Thus, the prosecutor informed the jury that the police had not investigated Y's death as a robbery gone wrong because at no time between the date of Y's death and the date on which the defendant testified did the defendant inform the police that a robbery had occurred. The prosecutor's remarks were not confined to the pre-*Miranda* or post-*Miranda* context but, instead, encompassed the full continuum of the defendant's silence.

The natural and necessary impact of the prosecutor's statements on the jury, moreover, was reinforced by the statement on rebuttal that the state admits violated *Doyle*. During rebuttal argument, the prosecutor reminded the jury that "[t]here was a much bigger delay [than four months] in hearing about the missing large quantity of money." If there had been uncertainty about the time period referenced by the prosecutor's repeated reminder that the defendant's in-court testimony was the "first time" the defendant told his exculpatory story, that doubt was removed when the prosecutor explained that the defendant's silence far exceeded four months. The prosecutor's repeated rhetorical emphasis on the fact that the defendant remained silent until trial, the frequency of those references, and the explicit statement that the silence lasted much longer than four months lead us to conclude that the defendant's post-*Miranda* silence was used against him, in violation of *Doyle*.[7] We therefore conclude that the prosecutor's remarks were "fundamentally unfair," in violation of the defendant's fourteenth amendment right to due process. *State* v. *Montgomery*, 254 Conn. 694, 716, 759 A.2d 995 (2000).

Our inquiry does not end there, however, because *Doyle* violations are subject to harmless error analysis. See id., 717. Whether an error is harmful, as always, depends on its impact on the trier of fact and the result of the case. When the error involves a *Doyle* violation, "[t]he state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the *Doyle* violation]. . . .

"A *Doyle* violation may, in a particular case, be so

insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment [on] a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless when] a prosecutor does not focus [on] or highlight the defendant's silence in his cross-examination and closing remarks and [when] the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases [in which] the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact [during] closing argument, and extensive, [strongly worded] argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) Id., 718.

The state's harmless error argument erroneously focuses exclusively on the rebuttal argument and fails to consider the impact of the similar remarks the prosecutor made during his initial argument. It argues that the "single *Doyle* violation during rebuttal argument was harmless" but does not explain how the prosecutor's repeated emphasis on the defendant's post-*Miranda* silence during initial closing argument, which struck at the jugular of the defendant's exculpatory story that Y was killed during the course of a robbery, was harmless beyond a reasonable doubt. We therefore conclude that the state has failed to fulfill its burden of demonstrating harmlessness.[8] See, e.g., *State* v. *Tomlinson*, 340 Conn. 533, 548–64, 264 A.3d 950 (2021); *State* v. *Jacques*, 332 Conn. 271, 294, 210 A.3d 533 (2019). Accordingly, we reverse the defendant's conviction and remand for a new trial.

### III

Although our analysis in part II of this opinion is dispositive of the defendant's appeal, we nonetheless address the defendant's evidentiary claim because it is likely to arise on remand. The following additional facts and procedural history are relevant to this claim. Prior to trial, the state filed notice of its intent to present evidence of the defendant's prior uncharged misconduct for the purpose of demonstrating the defendant's intent and identity, pursuant to § 4-5 (c) of the Connecticut Code of Evidence. In particular, the state intended to elicit testimony from Jones "that she was romantically involved with [Y]" and that, "in early 2017, at a funeral, [the] defendant threatened her with a small black firearm." The defendant filed a motion in limine seeking to exclude this evidence, arguing in relevant part that it was irrelevant and more prejudicial than probative.

The trial court deferred ruling on the defendant's motion until trial, at which time it heard an offer of proof, outside the presence of the jury, with respect to

the content of Jones' proposed testimony. During the offer of proof, Jones testified that she dated Y from June, 2011, until July, 2012. After they broke up, Jones and Y "remained friends, even though [they] were not together," until they rekindled their romantic relationship "around the end of 2016" while Y was married to the defendant. In early 2017, Jones attended a funeral on Barber Street in Hartford. After the funeral, she and her siblings were standing outside talking when the defendant "pulled up in . . . a Pepsi blue, BMW two door . . . driving really fast . . . ." The defendant "almost hit the cur[b], and he jumped out" of the car, saying, "let me . . . talk to you, let me talk to you." Jones refused to talk to the defendant, who then drove away.

The defendant later returned while Jones and her siblings were still standing around talking. Jones did not see the defendant approach, but, when she turned around, the defendant was approximately one and one-half feet away, fumbling in his jacket. The defendant pulled out a gun and said, "I told you I wasn't no punk. I told you I wasn't no punk." After threatening Jones, the defendant left. The incident was not reported to the police.

The trial court determined that Jones' testimony was relevant and material to the defendant's motive to commit the crimes with which he was charged. Balancing the probative value of the evidence against its prejudicial effect, the court concluded that "there is no unfair surprise" and that neither the admission of the evidence nor any counterproof would "consume an undue amount of time . . . ." Additionally, the court found "that no side issue [would be] created and that, with the appropriate limit[ing] instruction, the facts offered would not unduly arouse the jurors' emotions, hostility or sympathy . . . ." The court further found that the uncharged misconduct was not remote in time, that it was "substantially less shocking than the crimes charged, [and] that the evidence [was] important to the case if the jury credit[ed] it. It is not cumulative in that there isn't in the evidence so far . . . similar evidence before the jury. And, although motive is not a factor in the crime charged, the court will likely charge the jury as to the importance of motive if [the jurors] believe it." On this basis, the court determined that the evidence was not unduly prejudicial.

Jones subsequently testified in front of the jury in substantial conformance with the testimony elicited during the offer of proof.[9] Jones also testified about another incident that occurred on March 26, 2017, in which the defendant abruptly entered her apartment unannounced to find her, Y, and P lying in bed. The defendant started yelling, "y'all doing this dyke shit in front of my daughter? This what y'all doing?" As the defendant approached the bed, Y called 911, and the

defendant fled.[10]

After the close of evidence and closing arguments, the trial court instructed the jury that it could consider Jones' testimony regarding the funeral incident "solely to show or establish . . . the motive for the commission of the crime alleged." The court warned the jury that it "may not consider such evidence as establishing a predisposition on the part of the defendant to commit the crime charged or to demonstrate a criminal propensity. You may consider such evidence, if you believe it, and further find [that] it logically, rationally, and conclusively supports the issues for which it is being offered by the state but only as it may bear on the [issue] of . . . motive on the part of the defendant."

On appeal, the defendant claims that Jones' testimony about the funeral incident improperly was admitted because it was irrelevant to the issue of motive. The defendant argues that his threatening conduct toward Jones did not reflect his animosity toward Y and, therefore, was not probative of his motive for committing the crimes charged. Alternatively, the defendant contends that the probative value of the evidence was outweighed by its prejudicial effect because it "portrayed the defendant as an aggressive, impulsive, out of control man who easily flew into a rage and who had access to a gun."[11] We disagree.

Although "[e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime," such evidence is admissible if it "is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 539–40, 107 A.3d 343 (2014). To determine whether evidence of prior uncharged misconduct is admissible for a proper purpose, we have adopted a two-pronged test: "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) Id., 540; see Conn. Code Evid. § 4-5 (a) and (c) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person" but is admissible for other purposes, "such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony").

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption

should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only [when] abuse of discretion is manifest or [when] an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 517, 180 A.3d 882 (2018).

The evidence of uncharged misconduct clearly was relevant to the issue of motive. Although motive is not an essential element of the crimes with which the defendant was charged, "[w]e previously have recognized the significance that proof of motive may have in a criminal case. . . . [S]uch evidence is both desirable and important. . . . It strengthens the state's case when an adequate motive can be shown. . . . Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. . . . This factor is to be weighed by the jury along with other evidence in the case." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013). "Evidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive." *State* v. *Lopez*, 280 Conn. 779, 795, 911 A.2d 1099 (2007). Of course, evidence of uncharged misconduct involving the same victim is especially relevant to demonstrate motive; see *State* v. *Gonzalez*, 167 Conn. App. 298, 310, 142 A.3d 1227, cert. denied, 323 Conn. 929, 149 A.3d 500 (2016); but evidence involving a different victim may be relevant if it has a logical tendency to explain the defendant's motive for the commission of the crime charged. See, e.g., *State* v. *Lopez*, supra, 793–97 (evidence that defendant threatened certain individual with gun was admissible to prove defendant's motive for crimes of murder and attempted murder because jury reasonably could have inferred that that individual was intended target); *State* v. *Hoyeson*, 154 Conn. 302, 304, 307, 224 A.2d 735 (1966) (evidence of defendant's rape of and threat to " 'get' . . . a girl named Lucy" was admissible to demonstrate motive for "a vicious assault on [the victim]" because "the jury could infer that the defendant, in the darkness of the bedroom, mistook [the victim] for Lucy and committed the assault because of that mistake in identity"); *State* v. *Marrero-Alejandro*, 159 Conn. App. 376, 387, 122 A.3d 272 (2015) (evidence of defendant's threats toward victim's girlfriend and of "a love triangle" among victim, defendant, and victim's girlfriend was admissible to prove defendant's motive to murder victim), appeal dismissed, 324 Conn. 780, 154 A.3d 1005 (2017).

Evidence of Jones' romantic relationship with Y and the defendant's threatening conduct was relevant to explain to the jury the defendant's motive to kill Y. On the basis of Jones' testimony, the jury reasonably could have found that the defendant blamed the breakdown of his marriage on Y's romantic relationship with Jones,

at least in part. Jones testified that Y had "left [the defendant]" and was "living together [with Jones] pretty much by" March, 2017. The demise of the defendant's marriage was corroborated by text messages exchanged between the defendant and Y on the day of her death, in which the defendant pleaded with Y to "change [her] mind" about their relationship and to give him one more chance.

Jones' testimony that the defendant had threatened her with a gun supported a reasonable inference that the defendant was willing to resort to violence to end Y's relationship with Jones. The jury also could have inferred that this willingness to use violence extended to Y herself, in light of evidence that the defendant had threatened to kill Y and that Y had called the police after the defendant burst in on her in bed with Jones. We therefore conclude that the defendant's threatening conduct toward Jones was relevant and admissible for the purpose of establishing the defendant's motive to commit the crimes of conviction. See, e.g., *State* v. *Collins*, 299 Conn. 567, 587 n.19, 10 A.3d 1005 ("Evidence is relevant if it has *any* tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, [as] long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.)), cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

We next address whether the evidence was unduly prejudicial. To determine whether the prejudicial effect of evidence outweighs its probative value, a trial court is required to consider whether the evidence may (1) "unduly arouse the jury's emotions, hostility or sympathy," (2) "create a side issue that will unduly distract the jury from the main issues," (3) "consume an undue amount of time," or (4) unfairly surprise the defendant, who, "having no reasonable ground to anticipate the evidence, is . . . unprepared to meet it." (Internal quotation marks omitted.) Id., 587. We defer to the ruling of the trial court because of its "unique position to [observe] the context in which particular evidentiary issues arise" and its preeminent "position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Internal quotation marks omitted.) Id., 593 n.24.

The defendant's claim focuses on the first consideration, namely, whether the evidence of uncharged misconduct unduly aroused the emotions, hostility or sympathy of the jurors.[12] "This court has repeatedly held that [t]he prejudicial impact of uncharged misconduct evidence is assessed in light of its relative viciousness in comparison with the charged conduct." (Internal quotation marks omitted.) *State* v. *Raynor*, 337 Conn. 527,

562, 254 A.3d 874 (2020); see also *State* v. *Collins*, supra, 299 Conn. 588. The reasoning underlying this comparative analysis "is that the jurors' emotions are already aroused by the more severe crime of murder, for which the defendant is charged, and, thus, a less severe, uncharged crime is unlikely to arouse their emotions beyond that point." *State* v. *Raynor*, supra, 563.

The defendant's threatening conduct toward Jones was less severe than the charged crime of murder and, therefore, was unlikely to unduly arouse the emotions of the jurors. See, e.g., *State* v. *Campbell*, supra, 328 Conn. 523 ("It is beyond debate that, by comparison, shooting at the home where the defendant believed [the mother of his son] to be staying is less vicious than shooting the three victims in the head at close range. . . . Accordingly, the trial court acted within its discretion in admitting the prior misconduct evidence."); *State* v. *Beavers*, 290 Conn. 386, 405, 963 A.2d 956 (2009) ("it is significant that the prior misconduct evidence admitted involved only the defendant's actual, claimed or threatened damage of property for personal gain, as compared to the charged crime . . . [of] killing . . . a person for financial reasons"); *State* v. *Mooney*, 218 Conn. 85, 131, 588 A.2d 145 ("the seriousness of the subsequent crime, a larceny, pales in comparison to the robbery and felony murder charges for which the defendant was standing trial"), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). Additionally, the trial court issued a limiting instruction, which "minimize[d] any prejudicial effect that [the uncharged misconduct] evidence otherwise may have had . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 313 Conn. 325, 342, 96 A.3d 1238 (2014). Considering the record as a whole, we cannot conclude that the trial court abused its discretion in determining that the probative value of this evidence outweighed its prejudicial effect.[13]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** September 2, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Y's mother testified that the defendant was abusive toward Y and that, in March, 2017, less than one month before the murder, the defendant said that "he was going to kill [Y]."

[2] Y sustained three gunshot wounds: one to the face, one to the temple, and one to the shoulder.

[3] The trial court sentenced the defendant to fifty-five years of incarceration for the crime of murder and imposed a concurrent sentence of ten years of incarceration for the crime of criminal possession of a firearm, for a total effective sentence of fifty-five years.

[4] The defendant also claims that the prosecutor's comments on the defendant's silence impermissibly shifted the burden to the defendant to prove his innocence, in violation of *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Because we agree with the defendant that some of the prosecutor's challenged comments referred to the defendant's

post-*Miranda* silence, in violation of *Doyle*, we do not address the defendant's burden shifting claim.

[5] "This court has recognized that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt . . . ." (Citation omitted.) *State* v. *Lockhart*, 298 Conn. 537, 581, 4 A.3d 1176 (2010). It is unclear, however, whether pre-*Miranda* silence may be used as affirmative proof of guilt. See *State* v. *Angel T.*, 292 Conn. 262, 286 n.19, 973 A.2d 1207 (2009) ("there is a division of authority as to whether the use of a defendant's prearrest silence as substantive evidence of his guilt is constitutionally permissible under the fifth amendment, an issue that we need not consider"); see also *Combs* v. *Coyle*, 205 F.3d 269, 282 (6th Cir.) ("The [federal courts of appeals] that have considered whether the government may comment on a defendant's prearrest silence in its [case-in-chief] are . . . divided. Three circuits have held that such use violates the privilege against self-incrimination found in the [f]ifth [a]mendment . . . . Three circuits, on the other hand, have reached the opposite conclusion." (Citations omitted; footnote omitted.)), cert. denied sub nom. *Bagley* v. *Combs*, 531 U.S. 1035, 121 S. Ct. 623, 148 L. Ed. 2d 533 (2000). We need not address this issue because the defendant's claim is limited to the prosecutor's commentary on the defendant's post-*Miranda* silence.

[6] As these cases suggest, a distinction exists between postarrest silence and post-*Miranda* silence. In *Fletcher* v. *Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), the United States Supreme Court held that a defendant's due process rights are not violated when the government adduces evidence of the defendant's postarrest silence unless the record affirmatively "indicate[s] that [the defendant] received any *Miranda* warnings during the period in which he remained silent immediately after his arrest." Id., 605. The court explained that, "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a [s]tate to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A [s]tate is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." Id., 607. But see *State* v. *Leecan*, 198 Conn. 517, 526, 504 A.2d 480 (holding "that postarrest silence is inadmissible under principles of the law of evidence . . . [b]ecause many persons, even in the absence of a *Miranda* warning, are aware of their right to remain silent and are frequently advised by counsel to exercise that right when arrested"), cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). In the present case, it is undisputed that the defendant received *Miranda* warnings at the time of his arrest, and, therefore, any reference to the defendant's postarrest silence also was a reference to his post-*Miranda* silence.

[7] The state does not claim that the defendant opened the door to commentary on his post-*Miranda* silence by offering an explanation for that silence other than his reliance on the implicit promise of the *Miranda* warnings. See, e.g., *United States ex rel. Saulsbury* v. *Greer*, 702 F.2d 651, 656 (7th Cir.) (The court concluded that there was no *Doyle* violation because, on direct examination, the defendant "assign[ed] a reason for [his] silence immediately after arrest" and, by doing so, "chose to indicate to the jury that silence had probative weight and removed that subject from the realm of insoluble ambiguity about which there could be no comment. Having ventured that far, the defense could not erect a constitutional barrier against the state exploring the soundness of that explanation . . . ."), cert. denied, 461 U.S. 935, 103 S. Ct. 2104, 77 L. Ed. 2d 310 (1983); *State* v. *Anglin*, 751 A.2d 1007, 1010 (Me. 2000) (there was no *Doyle* violation because "[d]efense counsel opened the door for the [s]tate's questions and the court did not err in allowing the answer [into] evidence"); *State* v. *Cockrell*, 306 Wis. 2d 52, 69–70, 741 N.W.2d 267 (App.) (There was no *Doyle* violation because the defendant "chose to volunteer what he did and did not say to the police and why. In these circumstances it is not fundamentally unfair to permit the [s]tate to explor[e] the soundness" of the defendant's explanation.), review denied, 306 Wis. 2d 46, 744 N.W.2d 295 (2007). Nor does the state argue that the prosecutor's commentary on the defendant's post-*Miranda* silence was a " 'fair response' " to the defendant's testimony or the arguments of defense counsel criticizing the adequacy of the police investigation. See *State* v. *Anglin*, supra, 1010; cf. *United States* v. *Robinson*, 485 U.S. 25, 32, 108 S. Ct. 864, 99 L. Ed. 2d 23 (1988) ("[When] the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* [v. *California*, 380 U.S. 609, 614, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)] holds that the privilege against compulsory self-incrimination

is violated. But [when] . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by [the] defendant or his counsel, we think there is no violation of the privilege."). We therefore do not address these issues.

[8] Although the evidence was sufficient to support the defendant's conviction; see part I of this opinion; we disagree with the state that it was overwhelming. As we previously noted, there was no direct, physical, or forensic evidence implicating the defendant in Y's murder; instead, the state's case against the defendant was largely circumstantial, resting on the defendant's motive, means, and opportunity to commit the crime and his flight from the scene. At trial, the defendant testified that his flight was motivated by fear, rather than guilt, because someone else killed Y during the course of a robbery in which a large quantity of money and illicit drugs was stolen. As to the identity of the perpetrator, the defendant raised a third-party culpability defense, arguing that Thomas also had the motive, means, and opportunity to murder Y. Defense counsel pointed out that, after the murder, Thomas was in possession of the defendant's cell phone and the gray Chevrolet Malibu captured on video leaving the scene of the crime. Defense counsel argued that Thomas was motivated by greed because he knew that the defendant had money and drugs stashed away inside the apartment. Thus, the defendant raised a plausible, alternative theory of culpability. On the present evidentiary record, we cannot conclude that the evidence of the defendant's guilt was overwhelming or that the defendant's exculpatory story was transparently frivolous. See *State* v. *Brunetti*, supra, 279 Conn. 82–86 (*Doyle* violation was harmless beyond reasonable doubt because defendant confessed to crime, police found clothing soaked in victim's blood in defendant's home, and defendant's exculpatory story that he removed his clothing and that someone else dipped it in victim's blood "was 'transparently frivolous' "); *State* v. *Montgomery*, supra, 254 Conn. 718–20 (*Doyle* violation was harmless beyond reasonable doubt, in part because of overwhelming evidence of defendant's guilt, which consisted of eyewitness testimony identifying him as perpetrator with " '100 percent' " certainty, his purchase of murder weapon, his confession to his cellmate, and discovery of "other incriminating evidence in [his] car, including a knife, a can of Mace, latex gloves, duct tape, and an ice pick").

[9] In front of the jury, Jones testified that the funeral incident occurred in late 2016, whereas, during the offer of proof, she testified that it occurred in early 2017. Her description of the defendant's threatening conduct, however, was the same.

[10] Defense counsel moved to exclude Jones' testimony about the bedroom incident, but the trial court overruled counsel's objection, concluding that the evidence was relevant to prove the defendant's malice and motive and was not unduly prejudicial. The defendant does not challenge the admission of this evidence on appeal.

[11] The defendant also claims that, even if the evidence of uncharged misconduct was probative of his motive to commit the crimes of conviction, the trial court should have redacted Jones' reference to the defendant's use of a gun. The defense did not seek redaction in the trial court and, therefore, failed to preserve this claim for our review. See, e.g., *State* v. *Tomlinson*, supra, 340 Conn. 571 (declining to review unpreserved claim "that the trial court should have redacted portions of the rap music video or allowed only limited screenshots of the video into evidence" because defense counsel "did not preserve a request for redaction"); *State* v. *Komisarjevsky*, 338 Conn. 526, 616 n.65, 258 A.3d 1166 (declining to review unpreserved claim regarding redaction), cert. denied,    U.S.   , 142 S. Ct. 617, 211 L. Ed. 2d 384 (2021).

[12] The defendant also claims that this evidence was cumulative of other evidence of the defendant's motive and, therefore, should have been excluded. See, e.g., *State* v. *Onofrio*, 179 Conn. 23, 29–30, 425 A.2d 560 (1979) ("if the issue to be proved is competent *but can just as well be demonstrated by other evidence*, or if the evidence is of but slight weight or importance [on] that point, a trial judge is justified in excluding the evidence entirely, if its probative value is marginal and its prejudicial tendencies clear" (emphasis added)). Specifically, the defendant argues that Jones' testimony regarding the bedroom incident—in which the defendant broke down the door to Jones' apartment and, upon finding Jones and Y in bed, yelled, "[y]'all doing this dyke shit in front of my daughter? This what y'all doing?"—was sufficient "to prove that the defendant was unhappy about the relationship between . . . Jones and [Y] . . . ." We reject this claim because the defendant's threatening conduct during the funeral incident was different, both in nature and degree, from his threatening conduct

during the bedroom incident. Therefore, the challenged evidence "was not cumulative because it . . . presented the jury with *new* material, not heard from any other witness . . . ." (Emphasis in original.) *State* v. *Fernando V.*, 331 Conn. 201, 219, 202 A.3d 350 (2019).

[13] The trial court has "some degree of choice" in balancing the probative value of uncharged misconduct evidence against its prejudicial effect; (internal quotation marks omitted) *State* v. *Collins*, supra, 299 Conn. 593 n.24; and, on remand, a different trial court might arrive at a different conclusion. We hold only that, on the present record, the trial court's decision to admit the challenged evidence was not arbitrary or unreasonable. See, e.g., *State* v. *Smith*, supra, 313 Conn. 336 ("[T]he question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Internal quotation marks omitted.)).